# CALIFORNIA *v.* GREENWOOD ET AL.

No. 86–684.  Argued January 11, 1988—Decided May 16, 1988

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, STEVENS, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 45. KENNEDY, J., took no part in the consideration or decision of the case.

*Michael J. Pear* argued the cause for petitioner. With him on the briefs were *Cecil Hicks* and *Michael R. Capizzi.*

*Michael Ian Garey*, by appointment of the Court, 484 U. S. 808, argued the cause for respondents and filed a brief for respondent Greenwood. *Richard L. Schwartzberg* filed a brief for respondent Van Houten.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *John K. Van de Kamp*, Attorney General of California, *Steve White*, Chief Assistant Attorney General, *John H. Sugiyama*, Senior Assistant Attorney General, *Ronald E. Niver* and *Laurence K. Sullivan*, Supervising Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Robert Butterworth* of Florida, *Warren Price III* of Hawaii, *Linley E. Pearson* of Indiana, *David L. Armstrong* of Kentucky, *Hubert H. Humphrey III* of Minnesota, *LeRoy S. Zimmerman* of Pennsylvania, *Travis Medlock* of South Carolina, *W. J. Michael Cody* of Tennessee, *Kenneth O. Eikenberry* of Washington, *Donald J. Hanaway* of Wisconsin, and *Joseph B. Meyer* of Wyoming; and for Americans for Effec-

JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether the Fourth Amendment prohibits the warrantless search and seizure of garbage left for collection outside the curtilage of a home. We conclude, in accordance with the vast majority of lower courts that have addressed the issue, that it does not.

I

In early 1984, Investigator Jenny Stracner of the Laguna Beach Police Department received information indicating that respondent Greenwood might be engaged in narcotics trafficking. Stracner learned that a criminal suspect had informed a federal drug enforcement agent in February 1984 that a truck filled with illegal drugs was en route to the Laguna Beach address at which Greenwood resided. In addition, a neighbor complained of heavy vehicular traffic late at night in front of Greenwood's single-family home. The neighbor reported that the vehicles remained at Greenwood's house for only a few minutes.

Stracner sought to investigate this information by conducting a surveillance of Greenwood's home. She observed several vehicles make brief stops at the house during the late-night and early morning hours, and she followed a truck from the house to a residence that had previously been under investigation as a narcotics-trafficking location.

On April 6, 1984, Stracner asked the neighborhood's regular trash collector to pick up the plastic garbage bags that Greenwood had left on the curb in front of his house and to turn the bags over to her without mixing their contents with garbage from other houses. The trash collector cleaned his truck bin of other refuse, collected the garbage bags from the street in front of Greenwood's house, and turned the bags over to Stracner. The officer searched through the rubbish

tive Law Enforcement, Inc., et al. by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak, David Crump, Courtney A. Evans, Daniel B. Hales,* and *Jack E. Yelverton.*

and found items indicative of narcotics use. She recited the information that she had gleaned from the trash search in an affidavit in support of a warrant to search Greenwood's home.

Police officers encountered both respondents at the house later that day when they arrived to execute the warrant. The police discovered quantities of cocaine and hashish during their search of the house. Respondents were arrested on felony narcotics charges. They subsequently posted bail.

The police continued to receive reports of many late-night visitors to the Greenwood house. On May 4, Investigator Robert Rahaeuser obtained Greenwood's garbage from the regular trash collector in the same manner as had Stracner. The garbage again contained evidence of narcotics use.

Rahaeuser secured another search warrant for Greenwood's home based on the information from the second trash search. The police found more narcotics and evidence of narcotics trafficking when they executed the warrant. Greenwood was again arrested.

The Superior Court dismissed the charges against respondents on the authority of *People* v. *Krivda*, 5 Cal. 3d 357, 486 P. 2d 1262 (1971), which held that warrantless trash searches violate the Fourth Amendment and the California Constitution. The court found that the police would not have had probable cause to search the Greenwood home without the evidence obtained from the trash searches.

The Court of Appeal affirmed. 182 Cal. App. 3d 729, 227 Cal. Rptr. 539 (1986). The court noted at the outset that the fruits of warrantless trash searches could no longer be suppressed if *Krivda* were based only on the California Constitution, because since 1982 the State has barred the suppression of evidence seized in violation of California law but not federal law. See Cal. Const., Art. I, § 28(d); *In re Lance W.*, 37 Cal. 3d 873, 694 P. 2d 744 (1985). But *Krivda*, a decision binding on the Court of Appeal, also held that the fruits of warrantless trash searches were to be excluded under federal

law.  Hence, the Superior Court was correct in dismissing the charges against respondents.  182 Cal. App. 3d, at 735, 227 Cal. Rptr, at 542.[1]

The California Supreme Court denied the State's petition for review of the Court of Appeal's decision.  We granted certiorari, 483 U. S. 1019, and now reverse.

## II

The warrantless search and seizure of the garbage bags left at the curb outside the Greenwood house would violate the Fourth Amendment only if respondents manifested a subjective expectation of privacy in their garbage that society accepts as objectively reasonable.  *O'Connor* v. *Ortega,* 480 U. S. 709, 715 (1987); *California* v. *Ciraolo,* 476 U. S. 207, 211 (1986); *Oliver* v. *United States,* 466 U. S. 170, 177 (1984); *Katz* v. *United States,* 389 U. S. 347, 361 (1967) (Harlan, J., concurring).  Respondents do not disagree with this standard.

They assert, however, that they had, and exhibited, an expectation of privacy with respect to the trash that was searched by the police: The trash, which was placed on the street for collection at a fixed time, was contained in opaque plastic bags, which the garbage collector was expected to pick up, mingle with the trash of others, and deposit at the garbage dump.  The trash was only temporarily on the street, and there was little likelihood that it would be inspected by anyone.

It may well be that respondents did not expect that the contents of their garbage bags would become known to the police or other members of the public.  An expectation of privacy does not give rise to Fourth Amendment protection,

---

[1] The Court of Appeal also held that respondent Van Houten had standing to seek the suppression of evidence discovered during the April 4 search of Greenwood's home.  182 Cal. App. 3d, at 735, 227 Cal. Rptr., at 542–543.

however, unless society is prepared to accept that expectation as objectively reasonable.

Here, we conclude that respondents exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection. It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals,[2] children, scavengers,[3] snoops,[4] and other members of the public. See *Krivda, supra,* at 367, 486 P. 2d, at 1269. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage "in an area particularly suited for

---

[2] For example, *State* v. *Ronngren,* 361 N. W. 2d 224 (N. D. 1985), involved the search of a garbage bag that a dog, acting "at the behest of no one," *id.,* at 228, had dragged from the defendants' yard into the yard of a neighbor. The neighbor deposited the bag in his own trash can, which he later permitted the police to search. The North Dakota Supreme Court held that the search of the garbage bag did not violate the defendants' Fourth Amendment rights.

[3] It is not only the homeless of the Nation's cities who make use of others' refuse. For example, a nationally syndicated consumer columnist has suggested that apartment dwellers obtain cents-off coupons by "mak[ing] friends with the fellow who handles the trash" in their buildings, and has recounted the tale of "the 'Rich lady' from Westmont who once a week puts on rubber gloves and hip boots and wades into the town garbage dump looking for labels and other proofs of purchase" needed to obtain manufacturers' refunds. M. Sloane, "The Supermarket Shopper's" 1980 Guide to Coupons and Refunds 74, 161 (1980).

[4] Even the refuse of prominent Americans has not been invulnerable. In 1975, for example, a reporter for a weekly tabloid seized five bags of garbage from the sidewalk outside the home of Secretary of State Henry Kissinger. Washington Post, July 9, 1975, p. A1, col. 8. A newspaper editorial criticizing this journalistic "trash-picking" observed that "[e]vidently . . . 'everybody does it.'" Washington Post, July 10, 1975, p. A18, col. 1. We of course do not, as the dissent implies, "bas[e] [our] conclusion" that individuals have no reasonable expectation of privacy in their garbage on this "sole incident." *Post,* at 51.

public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it," *United States* v. *Reicherter,* 647 F. 2d 397, 399 (CA3 1981), respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded.

Furthermore, as we have held, the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public. Hence, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz* v. *United States, supra,* at 351. We held in *Smith* v. *Maryland,* 442 U. S. 735 (1979), for example, that the police did not violate the Fourth Amendment by causing a pen register to be installed at the telephone company's offices to record the telephone numbers dialed by a criminal suspect. An individual has no legitimate expectation of privacy in the numbers dialed on his telephone, we reasoned, because he voluntarily conveys those numbers to the telephone company when he uses the telephone. Again, we observed that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.,* at 743–744.

Similarly, we held in *California* v. *Ciraolo, supra,* that the police were not required by the Fourth Amendment to obtain a warrant before conducting surveillance of the respondent's fenced backyard from a private plane flying at an altitude of 1,000 feet. We concluded that the respondent's expectation that his yard was protected from such surveillance was unreasonable because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Id.,* at 213–214.

Our conclusion that society would not accept as reasonable respondents' claim to an expectation of privacy in trash left for collection in an area accessible to the public is reinforced by the unanimous rejection of similar claims by the Federal Courts of Appeals. See *United States* v. *Dela Espriella,*

781 F. 2d 1432, 1437 (CA9 1986); *United States* v. *O'Bryant*, 775 F. 2d 1528, 1533–1534 (CA11 1985); *United States* v. *Michaels*, 726 F. 2d 1307, 1312–1313 (CA8), cert. denied, 469 U. S. 820 (1984); *United States* v. *Kramer*, 711 F. 2d 789, 791–794 (CA7), cert. denied, 464 U. S. 962 (1983); *United States* v. *Terry*, 702 F. 2d 299, 308–309 (CA2), cert. denied *sub nom. Williams* v. *United States*, 461 U. S. 931 (1983); *United States* v. *Reicherter, supra,* at 399; *United States* v. *Vahalik*, 606 F. 2d 99, 100–101 (CA5 1979) *(per curiam),* cert. denied, 444 U. S. 1081 (1980); *United States* v. *Crowell*, 586 F. 2d 1020, 1025 (CA4 1978), cert. denied, 440 U. S. 959 (1979); *Magda* v. *Benson*, 536 F. 2d 111, 112–113 (CA6 1976) *(per curiam); United States* v. *Mustone*, 469 F. 2d 970, 972–974 (CA1 1972).   In *United States* v. *Thornton*, 241 U. S. App. D. C. 46, 56, and n. 11, 746 F. 2d 39, 49, and n. 11 (1984), the court observed that "the overwhelming weight of authority rejects the proposition that a reasonable expectation of privacy exists with respect to trash discarded outside the home and the curtilege *[sic]* thereof."   In addition, of those state appellate courts that have considered the issue, the vast majority have held that the police may conduct warrantless searches and seizures of garbage discarded in public areas.   See *Commonwealth* v. *Chappee*, 397 Mass. 508, 512–513, 492 N. E. 2d 719, 721–722 (1986); *Cooks* v. *State*, 699 P. 2d 653, 656 (Okla. Crim.), cert. denied, 474 U. S. 935 (1985); *State* v. *Stevens*, 123 Wis. 2d 303, 314–317, 367 N. W. 2d 788, 794–797, cert. denied, 474 U. S. 852 (1985); *State* v. *Ronngren*, 361 N. W. 2d 224, 228–230 (N. D. 1985); *State* v. *Brown*, 20 Ohio App. 3d 36, 37–38, 484 N. E. 2d 215, 217–218 (1984); *State* v. *Oquist*, 327 N. W. 2d 587 (Minn. 1982); *People* v. *Whotte*, 113 Mich. App. 12, 317 N. W. 2d 266 (1982); *Commonwealth* v. *Minton*, 288 Pa. Super. 381, 391, 432 A. 2d 212, 217 (1981); *State* v. *Schultz*, 388 So. 2d 1326 (Fla. App. 1980); *People* v. *Huddleston*, 38 Ill. App. 3d 277, 347 N. E. 2d 76 (1976); *Willis* v. *State*, 518 S. W. 2d 247, 249 (Tex. Crim. App. 1975); *Smith* v. *State*, 510 P. 2d 793 (Alaska), cert. denied,

414 U. S. 1086 (1973); *State* v. *Fassler,* 108 Ariz. 586, 592–593, 503 P. 2d 807, 813–814 (1972); *Croker* v. *State,* 477 P. 2d 122, 125–126 (Wyo. 1970); *State* v. *Purvis,* 249 Ore. 404, 411, 438 P. 2d 1002, 1005 (1968). But see *State* v. *Tanaka,* 67 Haw. 658, 701 P. 2d 1274 (1985); *People* v. *Krivda,* 5 Cal. 3d 357, 486 P. 2d 1262 (1971).[5]

## III

We reject respondent Greenwood's alternative argument for affirmance: that his expectation of privacy in his garbage should be deemed reasonable as a matter of federal constitutional law because the warrantless search and seizure of his garbage was impermissible as a matter of California law. He urges that the state-law right of Californians to privacy in their garbage, announced by the California Supreme Court in *Krivda, supra,* survived the subsequent state constitutional amendment eliminating the suppression remedy as a means of enforcing that right. See *In re Lance W.,* 37 Cal. 3d, at 886–887, 694 P. 2d, at 752–753. Hence, he argues that the Fourth Amendment should itself vindicate that right.

Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution. We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs. We have emphasized instead that the Fourth Amendment analysis must turn on such factors as "our *societal* understanding that certain areas deserve the most scrupulous protection from government invasion." *Oliver* v. *United States,* 466 U. S., at 178 (emphasis added). See also *Rakas* v. *Illinois,* 439 U. S. 128, 143–144, n. 12 (1978). We have already concluded that society as a whole possesses no such under-

---

[5] Given that the dissenters are among the tiny minority of judges whose views are contrary to ours, we are distinctly unimpressed with the dissent's prediction that "society will be shocked to learn" of today's decision. *Post,* at 46.

standing with regard to garbage left for collection at the side of a public street. Respondent's argument is no less than a suggestion that concepts of privacy under the laws of each State are to determine the reach of the Fourth Amendment. We do not accept this submission.

## IV

Greenwood finally urges as an additional ground for affirmance that the California constitutional amendment eliminating the exclusionary rule for evidence seized in violation of state but not federal law violates the Due Process Clause of the Fourteenth Amendment. In his view, having recognized a state-law right to be free from warrantless searches of garbage, California may not under the Due Process Clause deprive its citizens of what he describes as "the only effective deterrent" to violations of this right. Greenwood concedes that no direct support for his position can be found in the decisions of this Court. He relies instead on cases holding that individuals are entitled to certain procedural protections before they can be deprived of a liberty or property interest created by state law. See *Hewitt* v. *Helms*, 459 U. S. 460 (1983); *Vitek* v. *Jones*, 445 U. S. 480 (1980).

We see no merit in Greenwood's position. California could amend its Constitution to negate the holding in *Krivda* that state law forbids warrantless searches of trash. We are convinced that the State may likewise eliminate the exclusionary rule as a remedy for violations of that right. At the federal level, we have not required that evidence obtained in violation of the Fourth Amendment be suppressed in all circumstances. See, *e. g.*, *United States* v. *Leon*, 468 U. S. 897 (1984); *United States* v. *Janis*, 428 U. S. 433 (1976); *United States* v. *Calandra*, 414 U. S. 338 (1974). Rather, our decisions concerning the scope of the Fourth Amendment exclusionary rule have balanced the benefits of deterring police misconduct against the costs of excluding reliable evidence of criminal activity. See *Leon*, 468 U. S., at 908–913. We

have declined to apply the exclusionary rule indiscriminately "when law enforcement officers have acted in objective good faith or their transgressions have been minor," because "the magnitude of the benefit conferred on . . . guilty defendants [in such circumstances] offends basic concepts of the criminal justice system." *Id.*, at 908 (citing *Stone* v. *Powell*, 428 U. S. 465, 490 (1976)).

The States are not foreclosed by the Due Process Clause from using a similar balancing approach to delineate the scope of their own exclusionary rules. Hence, the people of California could permissibly conclude that the benefits of excluding relevant evidence of criminal activity do not outweigh the costs when the police conduct at issue does not violate federal law.

## V

The judgment of the California Court of Appeal is therefore reversed, and this case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Every week for two months, and at least once more a month later, the Laguna Beach police clawed through the trash that respondent Greenwood left in opaque, sealed bags on the curb outside his home. Record 113. Complete strangers minutely scrutinized their bounty, undoubtedly dredging up intimate details of Greenwood's private life and habits. The intrusions proceeded without a warrant, and no court before or since has concluded that the police acted on probable cause to believe Greenwood was engaged in any criminal activity.

Scrutiny of another's trash is contrary to commonly accepted notions of civilized behavior. I suspect, therefore,

that members of our society will be shocked to learn that the Court, the ultimate guarantor of liberty, deems unreasonable our expectation that the aspects of our private lives that are concealed safely in a trash bag will not become public.

## I

"A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant." *United States* v. *Jacobsen*, 466 U. S. 109, 120, n. 17 (1984) (citations omitted). Thus, as the Court observes, if Greenwood had a reasonable expectation that the contents of the bags that he placed on the curb would remain private, the warrantless search of those bags violated the Fourth Amendment. *Ante*, at 39.

The Framers of the Fourth Amendment understood that "unreasonable searches" of "paper[s] and effects"—no less than "unreasonable searches" of "person[s] and houses"—infringe privacy. As early as 1878, this Court acknowledged that the contents of "[l]etters and sealed packages . . . in the mail are as fully guarded from examination and inspection . . . as if they were retained by the parties forwarding them in their own domiciles." *Ex parte Jackson*, 96 U. S. 727, 733. In short, so long as a package is "closed against inspection," the Fourth Amendment protects its contents, "wherever they may be," and the police must obtain a warrant to search it just "as is required when papers are subjected to search in one's own household." *Ibid.* Accord, *United States* v. *Van Leeuwen*, 397 U. S. 249 (1970).

With the emergence of the reasonable-expectation-of-privacy analysis, see *Katz* v. *United States*, 389 U. S. 347, 361 (1967) (Harlan, J., concurring); *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979), we have reaffirmed this fundamental principle. In *Robbins* v. *California*, 453 U. S. 420 (1981), for example, Justice Stewart, writing for a plurality of four, pronounced that "unless the container is such that its contents may be said to be in plain view, those contents are fully

protected by the Fourth Amendment," *id.*, at 427, and soundly rejected any distinction for Fourth Amendment purposes among various opaque, sealed containers:

> "[E]ven if one wished to import such a distinction into the Fourth Amendment, it is difficult if not impossible to perceive any objective criteria by which that task might be accomplished. What one person may put into a suitcase, another may put into a paper bag. . . . And . . . no court, no constable, no citizen, can sensibly be asked to distinguish the relative 'privacy interests' in a closed suitcase, briefcase, portfolio, duffelbag, or box." *Id.*, at 426–427.

See also *id.*, at 428 (expectation of privacy attaches to any container unless it "so clearly announce[s] its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer"). With only one exception, every Justice who wrote in that case eschewed any attempt to distinguish "worthy" from "unworthy" containers.[1]

More recently, in *United States* v. *Ross*, 456 U. S. 798 (1982), the Court, relying on the "virtually unanimous agree-

[1] See 453 U. S., at 436 (BLACKMUN, J., dissenting); *id.*, at 437 (REHNQUIST, J., dissenting); *id.*, at 444 (STEVENS, J., dissenting). But see *id.*, at 433–434 (Powell, J., concurring in judgment) (rejecting position that all containers, even "the most trivial," like "a cigarbox or a Dixie cup," are entitled to the same Fourth Amendment protection). Cf. *New York* v. *Belton*, 453 U. S. 454, 460–461, n. 4 (1981) (defining "container," for purposes of search incident to a lawful custodial arrest, as "any object capable of holding another object," including "luggage, boxes, bags, clothing, and the like").

In addition to finding that Robbins had a reasonable expectation of privacy in his duffelbag and plastic-wrapped packages, the Court also held that the automobile exception to the warrant requirement, see *Carroll* v. *United States*, 267 U. S. 132, 153 (1925), did not apply to packages found in an automobile. The Court overruled the latter determination in *United States* v. *Ross*, 456 U. S. 798 (1982), but reaffirmed that where, as here, the automobile exception is inapplicable, police may not conduct a warrantless search of any container that conceals its contents.

ment in *Robbins* . . . that a constitutional distinction between 'worthy' and 'unworthy' containers would be improper," held that a distinction among "paper bags, locked trunks, lunch buckets, and orange crates" would be inconsistent with

> "the central purpose of the Fourth Amendment. . . . [A] traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case.
>
> "As Justice Stewart stated in *Robbins*, the Fourth Amendment provides protection to the owner of *every container that conceals its contents from plain view*." *Id.*, at 822–823 (emphasis added; footnote and citation omitted).

See also *Jacobsen, supra,* at 129 (opinion of WHITE, J.).

Accordingly, we have found a reasonable expectation of privacy in the contents of a 200-pound "double-locked footlocker," *United States* v. *Chadwick*, 433 U. S. 1, 11 (1977); a "comparatively small, unlocked suitcase," *Arkansas* v. *Sanders*, 442 U. S. 753, 762, n. 9 (1979); a "totebag," *Robbins*, 453 U. S., at 422; and "packages wrapped in green opaque plastic," *ibid.* See also *Ross, supra,* at 801, 822–823 (suggesting that a warrant would have been required to search a " 'lunch-type' brown paper bag" and a "zippered red leather pouch" had they not been found in an automobile); *Jacobsen, supra,* at 111, 114–115 (suggesting that a warrantless search of an "ordinary cardboard box wrapped in brown paper" would have violated the Fourth Amendment had a private party not already opened it).

Our precedent, therefore, leaves no room to doubt that had respondents been carrying their personal effects in opaque, sealed plastic bags—identical to the ones they placed on the curb—their privacy would have been protected from warrantless police intrusion. So far as Fourth Amendment protection is concerned, opaque plastic bags are every bit as

worthy as "packages wrapped in green opaque plastic" and "double-locked footlocker[s]." Cf. *Robbins, supra,* at 441 (REHNQUIST, J., dissenting) (objecting to Court's discovery of reasonable expectation of privacy in contents of "two plastic garbage bags").

## II

Respondents deserve no less protection just because Greenwood used the bags to discard rather than to transport his personal effects. Their contents are not inherently any less private, and Greenwood's decision to discard them, at least in the manner in which he did, does not diminish his expectation of privacy.[2]

---

[2] Both to support its position that society recognizes no reasonable privacy interest in sealed, opaque trash bags and to refute the prediction that "society will be shocked to learn" of that conclusion, *supra,* at 46, the Court relies heavily upon a collection of lower court cases finding no Fourth Amendment bar to trash searches. But the authority that leads the Court to be "distinctly unimpressed" with our position, *ante,* at 43, n. 5, is itself impressively undistinguished. Of 11 Federal Court of Appeals cases cited by the Court, at least 2 are factually or legally distinguishable, see *United States* v. *O'Bryant,* 775 F. 2d 1528, 1533–1534 (CA11 1985) (police may search an apparently valuable briefcase "discarded next to an overflowing trash bin on a busy city street"); *United States* v. *Thornton,* 241 U. S. App. D. C. 46, 56, 746 F. 2d 39, 49 (1984) (reasonable federal agents could believe in good faith that a trash search is legal), and 7 rely entirely or almost entirely on an abandonment theory that, as noted *infra,* at 51, the Court has discredited, see *United States* v. *Dela Espriella,* 781 F. 2d 1432, 1437 (CA9 1986) ("The question, then, becomes whether placing garbage for collection constitutes abandonment of property"); *United States* v. *Terry,* 702 F. 2d 299, 308–309 (CA2) ("[T]he circumstances in this case clearly evidence abandonment by Williams of his trash"), cert. denied *sub nom. Williams* v. *United States,* 461 U. S. 931 (1983); *United States* v. *Reicherter,* 647 F. 2d 397, 399 (CA3 1981) ("[T]he placing of trash in garbage cans at a time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment"); *United States* v. *Vahalik,* 606 F. 2d 99, 100–101 (CA5 1979) *(per curiam)* ("[T]he act of placing garbage for collection is an act of abandonment which terminates any fourth amendment protection"), cert. denied, 444 U. S. 1081 (1980); *United States* v. *Crowell,* 586 F. 2d 1020, 1025 (CA4 1978) ("The act of placing

A trash bag, like any of the above-mentioned containers, "is a common repository for one's personal effects" and, even more than many of them, is "therefore . . . inevitably associated with the expectation of privacy." *Sanders, supra,* at 762 (citing *Chadwick, supra,* at 13). "[A]lmost every human activity ultimately manifests itself in waste products . . . ." *Smith* v. *State,* 510 P. 2d 793, 798 (Alaska), cert. denied, 414 U. S. 1086 (1973). See *California* v. *Rooney,* 483 U. S. 307, 320–321, n. 3 (1987) (WHITE, J., dissenting) (renowned archaeologist Emil Haury once said, "[i]f you want to know what is really going on in a community, look at its garbage") (quoted by W. Rathje, Archaeological Ethnography . . . Because Sometimes It Is Better to Give Than to Receive, in Explorations in Ethnoarchaeology 49, 54 (R. Gould ed. 1978)); Weberman, The Art of Garbage Analysis: You Are What You Throw Away, 76 Esquire 113 (1971) (analyzing trash of various celebrities and drawing conclusions about their private lives). A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it. A search of trash, like a search of the bedroom, can relate intimate details about sexual practices, health, and personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships, and romantic interests. It cannot be doubted that a sealed trash bag harbors telling evidence of the "intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" which the Fourth Amendment is designed

---

[garbage] for collection is an act of abandonment and what happens to it thereafter is not within the protection of the fourth amendment"), cert. denied, 440 U. S. 959 (1979); *Magda* v. *Benson,* 536 F. 2d 111, 112 (CA6 1976) *(per curiam)* ("[F]ederal case law . . . holds that garbage . . . is abandoned and no longer protected by the Fourth Amendment"); *United States* v. *Mustone,* 469 F. 2d 970, 972 (CA1 1972) (when defendant "deposited the bags on the sidewalk he abandoned them"). A reading of the Court's collection of state-court cases reveals an equally unimpressive pattern.

to protect. *Oliver* v. *United States*, 466 U. S. 170, 180 (1984) (quoting *Boyd* v. *United States*, 116 U. S. 616, 630 (1886)). See also *United States* v. *Dunn*, 480 U. S. 294, 300 (1987).

The Court properly rejects the State's attempt to distinguish trash searches from other searches on the theory that trash is abandoned and therefore not entitled to an expectation of privacy. As the author of the Court's opinion observed last Term, a defendant's "property interest [in trash] does not settle the matter for Fourth Amendment purposes, for the reach of the Fourth Amendment is not determined by state property law." *Rooney, supra*, at 320 (WHITE, J., dissenting). In evaluating the reasonableness of Greenwood's expectation that his sealed trash bags would not be invaded, the Court has held that we must look to "understandings that are recognized and permitted by society."[3] Most of us, I believe, would be incensed to discover a meddler—whether a neighbor, a reporter, or a detective—scrutinizing our sealed trash containers to discover some detail of our personal lives. See *State* v. *Schultz*, 388 So. 2d 1326, 1331 (Fla. App. 1980) (Anstead, J., dissenting). That was, quite naturally, the reaction to the sole incident on which the Court bases its conclusion that "snoops" and the like defeat the expectation of privacy in trash. *Ante*, at 40, and n. 4. When a tabloid reporter examined then-Secretary of State

---

[3] *Rakas* v. *Illinois*, 439 U. S. 128, 143–144, n. 12 (1978). See *ante*, at 43 ("[T]he Fourth Amendment analysis must turn on such factors as 'our *societal* understanding that certain areas deserve the most scrupulous protection from government invasion'") (quoting *Oliver* v. *United States*, 466 U. S. 170, 178 (1984)); *Robbins* v. *California*, 453 U. S. 420, 428 (1981) (plurality opinion) ("Expectations of privacy are established by general social norms"); *Dow Chemical Co.* v. *United States*, 476 U. S. 227, 248 (1986) (opinion of Powell, J.); Bush & Bly, Expectation of Privacy Analysis and Warrantless Trash Reconnaissance after *Katz* v. *United States*, 23 Ariz. L. Rev. 283, 293 (1981) ("[S]ocial custom . . . serves as the most basic foundation of a great many legitimate privacy expectations") (citation omitted).

Henry Kissinger's trash and published his findings, Kissinger was "really revolted" by the intrusion and his wife suffered "grave anguish." N. Y. Times, July 9, 1975, p. A1, col. 8. The public response roundly condemning the reporter demonstrates that society not only recognized those reactions as reasonable, but shared them as well. Commentators variously characterized his conduct as "a disgusting invasion of personal privacy," Flieger, Investigative Trash, U. S. News & World Report, July 28, 1975, p. 72 (editor's page); "indefensible . . . as civilized behavior," Washington Post, July 10, 1975, p. A18, col. 1 (editorial); and contrary to "the way decent people behave in relation to each other," *ibid.*

Beyond a generalized expectation of privacy, many municipalities, whether for reasons of privacy, sanitation, or both, reinforce confidence in the integrity of sealed trash containers by "prohibit[ing] anyone, except authorized employees of the Town . . . , to rummage into, pick up, collect, move or otherwise interfere with articles or materials placed on . . . any public street for collection." *United States* v. *Dzialak*, 441 F. 2d 212, 215 (CA2 1971) (paraphrasing ordinance for town of Cheektowaga, New York). See also *United States* v. *Vahalik*, 606 F. 2d 99, 100 (CA5 1979) *(per curiam)*; *Magda* v. *Benson*, 536 F. 2d 111, 112 (CA6 1976) *(per curiam)*; *People* v. *Rooney*, 175 Cal. App. 3d 634, 645, 221 Cal. Rptr. 49, 56 (1985), cert. dism'd, 483 U. S. 307 (1987); *People* v. *Krivda*, 5 Cal. 3d 357, 366, 486 P. 2d 1262, 1268 (1971), vacated and remanded, 409 U. S. 33 (1972); *State* v. *Brown*, 20 Ohio App. 3d 36, 38, n. 3, 484 N. E. 2d 215, 218, n. 3 (1984). In fact, the California Constitution, as interpreted by the State's highest court, guarantees a right of privacy in trash vis-à-vis government officials. See *Krivda, supra* (recognizing right); *In re Lance W.*, 37 Cal. 3d 873, 886–887, 694 P. 2d 744, 752–753 (1985) (later constitutional amendment abolished exclusionary remedy but left intact the substance of the right).

That is not to deny that isolated intrusions into opaque, sealed trash containers occur. When, acting on their own, "animals, children, scavengers, snoops, [or] other members of the public," *ante*, at 40 (footnotes omitted), *actually* rummage through a bag of trash and expose its contents to plain view, "police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public," *ante*, at 41. That much follows from cases like *Jacobsen*, 466 U. S., at 117, 120, n. 17 (emphasis added), which held that police may constitutionally inspect a package whose "integrity" a private carrier has *already* "compromised," because "[t]he Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not *already* been frustrated"; and *California* v. *Ciraolo*, 476 U. S. 207, 213–214 (1986) (emphasis added), which held that the Fourth Amendment does not prohibit police from observing what "[a]ny member of the public flying in this airspace who glanced down *could* have seen."

Had Greenwood flaunted his intimate activity by strewing his trash all over the curb for all to see, or had some nongovernmental intruder invaded his privacy and done the same, I could accept the Court's conclusion that an expectation of privacy would have been unreasonable. Similarly, had police searching the city dump run across incriminating evidence that, despite commingling with the trash of others, still retained its identity as Greenwood's, we would have a different case. But all that Greenwood "exposed . . . to the public," *ante*, at 40, were the exteriors of several opaque, sealed containers. Until the bags were opened by police, they hid their contents from the public's view every bit as much as did Chadwick's double-locked footlocker and Robbins' green, plastic wrapping. Faithful application of the warrant requirement does not require police to "avert their eyes from evidence of criminal activity that could have been observed by any member of the public." Rather, it only requires them

to adhere to norms of privacy that members of the public plainly acknowledge.

The mere *possibility* that unwelcome meddlers *might* open and rummage through the containers does not negate the expectation of privacy in their contents any more than the possibility of a burglary negates an expectation of privacy in the home; or the possibility of a private intrusion negates an expectation of privacy in an unopened package; or the possibility that an operator will listen in on a telephone conversation negates an expectation of privacy in the words spoken on the telephone. "What a person . . . seeks to preserve as private, *even in an area accessible to the public,* may be constitutionally protected." *Katz,* 389 U. S., at 351–352. We have therefore repeatedly rejected attempts to justify a State's invasion of privacy on the ground that the privacy is not absolute. See *Chapman* v. *United States,* 365 U. S. 610, 616–617 (1961) (search of a house invaded tenant's Fourth Amendment rights even though landlord had authority to enter house for some purposes); *Stoner* v. *California,* 376 U. S. 483, 487–490 (1964) (implicit consent to janitorial personnel to enter motel room does not amount to consent to police search of room); *O'Connor* v. *Ortega,* 480 U. S. 709, 717 (1987) (a government employee has a reasonable expectation of privacy in his office, even though "it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office"). As JUSTICE SCALIA aptly put it, the Fourth Amendment protects "privacy . . . not solitude." *O'Connor, supra,* at 730 (opinion concurring in judgment).

Nor is it dispositive that "respondents placed their refuse at the curb for the express purpose of conveying it to a third party, . . . who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." *Ante,* at 40. In the first place, Greenwood can hardly be faulted for leaving trash on his curb when a county ordinance

commanded him to do so, Orange County Code § 4–3–45(a) (1986) (must "remov[e] from the premises at least once each week" all "solid waste created, produced or accumulated in or about [his] dwelling house"), and prohibited him from disposing of it in any other way, see Orange County Code § 3–3–85 (1988) (burning trash is unlawful). Unlike in other circumstances where privacy is compromised, Greenwood could not "avoid exposing personal belongings . . . by simply leaving them at home." *O'Connor, supra,* at 725. More importantly, even the voluntary relinquishment of possession or control over an effect does not necessarily amount to a relinquishment of a privacy expectation in it. Were it otherwise, a letter or package would lose all Fourth Amendment protection when placed in a mailbox or other depository with the "express purpose" of entrusting it to the postal officer or a private carrier; those bailees are just as likely as trash collectors (and certainly have greater incentive) to "sor[t] through" the personal effects entrusted to them, "or permi[t] others, such as police to do so." Yet, it has been clear for at least 110 years that the possibility of such an intrusion does not justify a warrantless search by police in the first instance. See *Ex parte Jackson,* 96 U. S. 727 (1878); *United States v. Van Leeuwen,* 397 U. S. 249 (1970); *United States v. Jacobsen, supra.*[4]

## III

In holding that the warrantless search of Greenwood's trash was consistent with the Fourth Amendment, the Court paints a grim picture of our society. It depicts a society in which local authorities may command their citizens to dispose of their personal effects in the manner least protective of the

---

[4] To be sure, statutes criminalizing interference with the mails might reinforce the expectation of privacy in mail, see, *e. g.,* 18 U. S. C. §§ 1701–1705, 1708, but the expectation of privacy in no way depends on statutory protection. In fact, none of the cases cited in the text even mention such statutes in finding Fourth Amendment protection in materials handed over to public or private carriers for delivery.

56

"sanctity of [the] home and the privacies of life," *Boyd* v. *United States*, 116 U. S., at 630, and then monitor them arbitrarily and without judicial oversight—a society that is not prepared to recognize as reasonable an individual's expectation of privacy in the most private of personal effects sealed in an opaque container and disposed of in a manner designed to commingle it imminently and inextricably with the trash of others. *Ante*, at 39. The American society with which I am familiar "chooses to dwell in reasonable security and freedom from surveillance," *Johnson* v. *United States*, 333 U. S. 10, 14 (1948), and is more dedicated to individual liberty and more sensitive to intrusions on the sanctity of the home than the Court is willing to acknowledge.

I dissent.