Cowin, J.
Defendant Angel Merced Cruz (“Cruz”) has been charged in two indictments with unlawful possession of a firearm and trafficking in cocaine. He has moved to suppress certain items seized as a result of a warrantless search of a garbage can. Defendant also seeks to suppress any evidence seized as a result of a subsequent search conducted with a warrant. Both parties have agreed that the warrant for the second search is grounded in the items seized in the warrantless search of the garbage can; therefore, if the warrantless search of the garbage can is invalid, so too is the search warrant based upon that warrantless search.
A motion to suppress hearing was held on April 9, 1996 at which one witness testified, Detective Clayton Soucie of the Lawrence Police Department. After the hearing and evaluation of the credibility of the testimony, I make the following findings and rulings.
FINDINGS OF FACT
On September 20, 1995 at 2:30 p.m., Detective Clayton Soucie of the Lawrence Police Department and other officers of that department were preparing to execute a search warrant[1] at #8 Springfield Street, an apartment unit. The apartment at #8 Springfield Street (“the apartment”) is in a two-story building that contains four apartments. The apartment has a porch which looks out onto Springfield Street.
The police were aware that the person whom they suspected of dealing drugs at the apartment is often out on the front porch and thus has a clear view of Springfield Street. To avoid being seen by the person on the front porch, Detective Soucie and a second detective were approaching the building that houses #8 (“the building”) by going through an alley at the side of that building. See attached diagram. The detectives planned that this approach would bring them to the front corner of the building without being observed by the person who generally looked out from the porch of the apartment.
The alley which the police were using to gain access to the apartment contains four or five blue plastic 40-gallon garbage barrels that have no covers. The barrels stand against the building. It is these containers and the right of access to them that are at the center of the instant motion.[3]
The alley that contains the garbage cans (“the alley”) is at the side of the building and runs between that building and another building that contains the "Popular Variety Store” (“the store”). The store is, thus, next to the building, but separated from it by the alley. The store has a rear door that opens onto the alley. That door is across from the barrels, about four feet away from them. By contrast, there is no direct opening from the building to the alley.
*367 At the rear edge of the building is a chain link fence that once had spanned the alley between the building and the store. At this time, however, three of the four fasteners that held the fence to the pole were broken; only one fastener remained intact. Because the fasteners were broken, the fence was not secured to the post. Instead, there was a hole, five feet high by a “couple” of feet wide. The hole was large enough for a person to walk through. The officers could, thus, pass through the fence without moving it aside at all. The fence did not appear to be a new one.
At the other end of the alley, the end on Springfield Street, there was also a chain link fence. The officers believed that this fence was open as well. Detective Soucie learned at a later time, however, that this fence had a gate with a chain on it. The gate was locked by a latch-type chain link.
The garbage barrels in question thus stood on the alley in an area between the locked chain link fence at the Springfield Street end and the broken chain link fence at the other end of the alley. The alley (and the barrels) are otherwise inaccessible as the only other access to the alley is by going through the store. Although any person could apparently enter the store, there is no evidence regarding who was permitted to use the rear door of the store.[4] Thus, I find that the general public cannot obtain access to the barrels except through the hole in the fence.
When Detective Soucie and the second detective were at the broken part of the fence, about to enter the alley, Detective Soucie observed the defendant come out the rear door of the store.[5] In his left hand was a clear plastic bag; his right hand held a black box. The defendant, moving quickly, traversed the four feet from the store door across the alley to the barrels that rested against the building. He put his hands in the barrel while watching Springfield Street which was to his right. He then looked to his left and appeared surprised when his gaze rested on the two detectives at the gate. The defendant turned away and returned to the store. Detective Soucie saw nothing in the defendant’s hands when he returned to the store.
The two detectives then entered the alley by going through the hole in the fence. They looked into the barrel where the defendant had put his hands. They saw a large garbage bag with a twistee on it. On top of the garbage bag was a clear plastic bag with a white powder in it. Next to the clear plastic bag was a square black box. Although Detective Soucie had not had any formal schooling in narcotics, he has participated in the execution of over 300 search warrants involving narcotics and has participated in the seizure of cocaine in clear plastic bags on more then fifty occasions. Based on Detective Soucie’s experience, he believed that the white powder in the bag was cocaine. After making that observation, Detective Soucie seized both the bag and the black box.[6]
Detective Soucie and the other detective then entered the store by means of the door that opened onto the alley. Inside the store he saw the defendant sweeping the floor.
The detectives returned to the barrels and observed that the remaining three barrels were clean, almost brand new. One of them had a green plastic garbage bag in it. There were no barrels other than these four barrels in any part of the alley.
Detective Soucie had no information as to the ownership of the barrels in question; nor did he see any numbers on the barrels.
DISCUSSION
There are many relevant facts unknown to the Court in this case, such as ownership of the barrels and whether the alley is a public or private way. For whatever reason, such evidence was not forthcoming at the instant hearing. The Commonwealth, of course, bears the burden of establishing the reasonableness of a warrantless search. The Commonwealth must show that the search was proper. Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974).
The Fourth Amendment and Article 14 of the Massachusetts Declaration of Rights protect from unreasonable search and seizure those areas in which individuals have an expectation of privacy that is reasonable. California v. Greenwood, 486 U.S. 35, 39 (1988); Commonwealth v. Pratt, 407 Mass. 647, 660-61 (1990). Thus, in analyzing a search or seizure, it is necessary to decide whether the individual against whom the fruit of the search or seizure is to be used as evidence had a subjective expectation of privacy in the place searched or the item seized and whether such an expectation is one that society would accept as reasonable. California v. Greenwood, supra at 39.
Whether the asserted expectation of privacy was objectively reasonable depends upon the particular facts involved and is determined by examining the circumstances of the case in light of several factors. Commonwealth v. One 1985 Ford Thunderbird Auto, 416 Mass. 603, 607 (1993). These factors include the nature of the intrusion, whether the government agents had a lawful right to be where they were, and the character of the location searched, i.e., whether the defendants owned the place or controlled access to it, whether the place was freely accessible to others and whether the defendant took normal precautions to protect his privacy. Commonwealth v. Panetti, 406 Mass. 230, 232 (1989); Commonwealth v. D’Onofrio, 396 Mass. 711, 716-17 (1986).
In cases involving the reasonableness of an expectation of privacy in trash and garbage, the Supreme Judicial Court has instructed that the focus is to be on the degree to which the garbage at issue was exposed, or accessible, to the public. “It is well established that, in general, government agents may make *368 a warrantless search of areas in which the public has free access, including areas in which trash or garbage is discarded.” Commonwealth v. Krisco Corp., 421 Mass. 37, 42-43 (1995).
The Supreme Judicial Court has considered the constitutional implications of searches of trash deposited on both commercial and residential property. See id.; Commonwealth v. Pratt, 407 Mass. 645 (1990); and Commonwealth v. Panetti, supra. The degree of public access is usually much higher in commercial areas than in residential ones. Commonwealth v. Krisco Corp., supra at 44. In this case, due to the dearth of evidence, it cannot be determined whether the area in question is a residential or commercial one.[7] Regardless, however, of what type area this alley is determined to be, the case seems to parallel closely the facts in Commonwealth v. Krisco Corp., supra.
In that case, the dumpster at issue
was located in an alley adjacent to the defendants’ business and, although strangers occasionally managed to throw objects into the dumpster, it was intended for use exclusively by the [defendants’] shop . . . Unlike cases finding no reasonable expectation of privacy, [the individual defendant] in the instant case took affirmative steps to protect his privacy interest in the dumpster. He installed gates at either end of the fenced alley and kept them closed until the waste hauler arrived.
Id. at 45.
The Court held that, given these factors, the judge was warranted in concluding that the defendants had shown a subjective expectation of privacy in the contents of the dumpster, an expectation which society would accept as reasonable. Id. at 45.
Similarly, in this case, whoever owned the barrels at issue (whether the owners of the building, the store, the building behind the store or any or all of them) had taken steps to protect their privacy interest in those barrels. There was no evidence whether the alley in question was a public or private one. Since the government bears the burden of proof in this warrantless search, I cannot conclude that this was a public alley. Although the enclosure was defective at the non-Springfield Street end, it was closed off by a locked chain link fence on the Springfield Street end. It had at one time been wholly closed off, as well, on the other end, at a point which would completely close off the barrels from public access. Thus, at one time, the existence of the locked gates evidenced a clear intent by the owners that they had a subjective expectation of privacy in the contents of the trash can. I conclude that this was an expectation that society would accept as reasonable.
Because the chain link fence was now broken at one end (the non-Springfield Street end) the Commonwealth argues that on the date in issue there was little or no expectation of privacy. The gate was broken and the fence did not appear to be new. Thus, the argument continues, any expectation of privacy that once had existed could not reasonably still exist. With a hole five feet high and “a couple of feet” wide it is not reasonable to expect that people will stay out of the area. This is particularly true, says the Commonwealth, in view of the fact that the occupants of a number of buildings had access to the alley.
I do not concur with the Commonwealth’s argument. The mere fact that one end of the fence was in disrepair with a hole in it does not indicate that its owner or owners had ceded any reasonable expectation of privacy in the barréis contained in the alley. By analogy, if one lives in a house surrounded by a fence and part of the fence is broken down, it cannot be said that the inhabitants of the house no longer have any expectation of privacy in their home or in the area between the fence and their home.
I do not eliminate the possibility that it might be the case that the properly owner who originally had an expectation of privacy had lost that expectation and permitted the enclosure to deteriorate. However, I cannot assume such a fact. Given the allocation of the burden of proof on this motion, the burden is on the Commonwealth to show that the state of disrepair reflects a past interest in privacy.
The locked fence at one end of the alley and the fence at the other end, albeit a broken fence, communicated to the public that someone did not intend others to enter the alley. The fact that the fence had fallen into disrepair is not sufficient to indicate that such expectation no longer exists or that it is not a reasonable one. There was insufficient evidence indicating how long the hole in the fence and the privacy expectation of the owner had existed. The Commonwealth bears the burden of establishing that there was no expectation of privacy or that such expectation was not reasonable. It has not sustained its burden.
ORDER
For the foregoing reasons, the defendant’s motion to suppress is ALLOWED.

No evidence was presented at the hearing regarding the items sought pursuant to the search warrant. The inference is that the warrant concerned narcotics.

Since possession is an element of the crime charged, there is no issue of standing, see Commonwealth v. Amendola, 406 Mass. 592 (1990), Commonwealth v. Frazier, 410 Mass. 235 (1991), and no one has raised this matter.

Rear doors of stores are often for employee use only; some are open to the public. Since this is a warrantless search, the government bears the burden of proof. See discussion infra. There is no basis for a finding that the public had access to the rear door.

Other detectives were also in the area. See diagram. They are not relevant to the instant motion.

It was later learned that the black box contained an electronic measuring scale.

Since this is a warrantless search, the government bears the burden of proof. No proof having been presented on the issue, I cannot find that this was a commercial area.