NOT DESIGNATED FOR PUBLICATION

No. 114,125

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

AMBER BARNES,
*Appellant.*

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed December 2, 2016. Reversed and remanded.

*Caroline Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Daniel D. Gilligan*, assistant district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., POWELL, J., and STUTZMAN, S.J.

*Per Curiam*: Officers from the Hutchinson Police Department searched Amber Dawn Barnes' residence on the evening of October 28, 2013, minutes after they were granted authority to do so by a search warrant signed by a district court judge. Based on items found at her house, Barnes was charged and convicted of possession of methamphetamine and possession of drug paraphernalia. She timely appeals, claiming the district court committed error in denying her motion to suppress the items seized in the search. We reverse and remand to the district court for further proceedings.

1

In October 2012, Arthur Adams was the target of a drug investigation by the Hutchinson Police Department. Officers obtained and executed a warrant for the search of Adams' residence and the vehicle he used. As a result, Adams was arrested and charged with drug-related crimes. In October 2013, members of the Reno County Drug Enforcement Unit (D.E.U.) received information from four confidential informants that Adams was engaged in the illegal sale of drugs. The informants provided information about where Adams was living, which officers later confirmed through records and observation.

Based on the tips from the informants, the officers renewed observation of Adams. They saw him driving the same vehicle he was using during the time when he was previously investigated. As they did surveillance on Adams, officers reported seeing him driving in a way they characterized as "counter-surveillance." They also watched as Adams drove to various homes, stopped to pick up a passenger, drove around the block, then returned to the pick-up point and dropped off the passenger, which they believed to be consistent with both drug sales and counter-surveillance tactics.

The officers watching Adams saw him go to the homes of at least three people whom they knew to have been involved with controlled substances. They also saw him go to an address on Forrest Street in Hutchinson. The D.E.U. got information from an anonymous Crime Stoppers tip that Amber Barnes lived at that address. That anonymous tip also asserted that Barnes was going to Wichita to buy drugs and that she was "possibly" selling methamphetamine from the address on Forrest Street. Officers in the D.E.U. saw Adams go to the address on Forrest Street several times a day, both day and night, often spending several hours at a time. They also saw him go from Barnes' residence to other locations to conduct what they believed were drug transactions. From

2

their observations, they concluded that Barnes was likely acting as a supplier of drugs to Adams, who then sold them around Hutchinson.

On October 28, 2013, Officer Darrin Pickering of the Hutchinson Police Department, a member of the D.E.U., coordinated an intercept of the trash left in a cart on the street at Barnes' address. That trash was taken to a different location for examination by officers. Among the contents of the trash was found a handwritten note with "Arthur" written on it, mail addressed to Barnes at the address on Forrest Street, a broken glass pipe with a burned residue, a small ziplock baggie that field-tested positive for methamphetamine, used syringes, and sandwich baggies with a corner torn off. The baggies with the torn corners were consistent with a packaging method the officers had seen used for sale of controlled substances.

Later that same day, Pickering presented an affidavit with the above information to a district court judge, asking for a warrant to search Barnes' residence on Forrest Street and the vehicle being used by Adams. The judge issued the warrant and, according to the return, it was executed only minutes later. At the residence, the officers found Barnes and her roommate, Nicholas Buckaloo, who lived primarily in the garage. The officers seized 10 items, including a cut straw with white, powdery residue found in Barnes' purse. Also in the bedroom with Barnes' purse the officers found a syringe loaded with a clear substance and taped to the nightstand. The items from Barnes' bedroom later tested positive for methamphetamine.

Barnes was arrested and charged with possession of methamphetamine and possession of drug paraphernalia. She filed a motion to suppress the evidence seized from her house, arguing that the affidavit presented to the judge contained insufficient facts to support a search warrant. The district court denied the motion to suppress. At her bench trial, Barnes renewed her motion to suppress all evidence from the search. The motion again was denied.

3

Buckaloo testified at Barnes' trial that all the drugs and paraphernalia found in the search were his. He said he told officers at the time of the search that everything in the garage and kitchen was his and added that he also kept drugs in Barnes' bedroom as well, including the loaded syringe. The district court found Barnes guilty of both charges.

ANALYSIS

*Did the district court err in denying Barnes' motion to suppress evidence from the search of her home?*

Barnes based her motion to suppress on the contention that the affidavit presented to support the warrant was insufficient to show probable cause for the search. The roles of the judge who reviews the affidavit and issues the warrant, and of a court reviewing that decision on appeal, are well defined. When an application for a warrant is presented:

> "A judge deciding whether an affidavit supplies probable cause for a search warrant considers the totality of the circumstances presented and makes 'a practical, common-sense decision whether a crime has been or is being committed and whether there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *State v. Hicks,* 282 Kan. 599, 613-14, 147 P.3d 1076 (2006)." *State v. Mullen*, 304 Kan. 347, 353, 371 P.3d 905 (2016).

And, when an appellate court is called on to review that decision:

> "When an affidavit in support of an application for search warrant is challenged, the task of the reviewing court is to ensure that the issuing magistrate had a substantial basis for concluding probable cause existed. This standard is inherently deferential. It does not demand that the reviewing court determine whether, as a matter of law, probable cause existed; rather, the standard translates to whether the affidavit provided a substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched. Because the reviewing court is able to evaluate the necessarily undisputed content of an affidavit as well as the issuing

4

magistrate, the reviewing court may perform its own evaluation of the affidavit's sufficiency under this deferential standard." *Hicks*, 282 Kan. 599, Syl. ¶ 2.

The Fourth Amendment to the United States Constitution guarantees the right to be free from "unreasonable searches and seizures" and requires warrants to be supported by "probable cause, supported by Oath or affirmation." Section 15 of the Kansas Constitution Bill of Rights provides the same protections. *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010). K.S.A. 2015 Supp. 22-2502(a) states, in relevant part:

"A search warrant shall be issued only upon the oral or written statement . . . of any person under oath or affirmation which states facts sufficient to show probable cause that a crime has been, is being or is about to be committed and which particularly describes a person, place or means of conveyance to be searched and things to be seized."

Barnes argues the affidavit presented with the application for the warrant to search her home failed to show that essential probable cause.

Barnes presents her argument in five parts:  (1) the affidavit presented to the magistrate requested a warrant to search Adams' residence, not hers; (2) most of the information in the affidavit pertained to Adams, not to her; (3) the Crime Stoppers tip was uncorroborated and insufficient to support a probable cause finding; (4) the affidavit offered no substantiation for Pickering's conclusion that Barnes was supplying Adams with drugs; and (5) the items taken in the trash pull failed to provide a basis for a probable cause finding. Finally, Barnes argues that if we find the affidavit was insufficient, the good-faith exception from *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), does not apply.

We address Barnes' first argument separately. In its brief, the State responded to the potentially dispositive argument that the affidavit did not refer to Barnes' home as the property subject to the search request. The State explained that in the record sent to the

5

appellate court, the wrong affidavit was paired with the warrant for Barnes' property and the clerical error was corrected as soon as it was known. No contrary reply was filed and the record does contain an affidavit specifically coupled to a request for search of Barnes' home.

Barnes' remaining arguments about the alleged shortcomings of the affidavit take to task the parts specifically directed to her. We will consider each of her arguments before assessing the affidavit as a whole.

*Crime Stoppers tip*

Perhaps most significant of the few statements about Barnes that Pickering included in his affidavit was: "Based on my training and experience, and the Crime [S]toppers tip, it would appear that Barnes is supplying Adams with drugs, and that he then sells drugs throughout the Hutchinson community." Barnes argues that the Crime Stoppers tip contributed nothing to the affidavit's showing of probable cause for search.

The State defends the tip, contending that it was corroborated by other information in the affidavit. The State highlights Adams' observed visits to the house and the trash pull that included Barnes' mail which confirmed her address as given in the tip, the baggies with torn corners, and the bag that field-tested positive for methamphetamine. When considered with the other information, the State maintains the tip added support for probable cause.

Our Supreme Court has held that anonymous tips, standing alone, carry little weight in support of decisions to be made by law enforcement officers and courts. That court recently reviewed the issue in the context of a vehicle stop:

6

"As we explained in *State v. Slater*, 267 Kan. 694, 986 P.2d 1038 (1999), [an anonymous] tip is among the least reliable.

"'The reliability of the information or the tip given to the police depends upon the type of tip involved. The most favored of the tips are those which are, in fact, not really anonymous at all. These tips occur when the person giving the tip gives the police his or her name and address, or identifies himself or herself in such a way that he or she can be held accountable for the tip. Second on the scale of reliability are those tips in which, although the informant does not identify himself or herself, the informant gives enough information that his or her identity may be ascertained. This occurs where the informant states that he or she is calling from his or her place of business, or where the informant in person makes contact with the police officer. Less reliable is an anonymous tip that is truly anonymous where the veracity of the informant cannot be determined.' 267 Kan. 694, Syl. ¶ 4" *State v. Chapman*, 305 Kan.___, 381 P.3d 458, 463-64 (2016).

The usefulness of a tip is further dependent on the quantity and quality of information it provides. *Slater*, 267 Kan. at 695 (detail given about observed criminal activity is factor to be used to evaluate anonymous tip as basis for investigatory stop of vehicle).

In this case, the Crime Stoppers tip, as reported in the affidavit, failed to say how the tip informant knew where Barnes lived, how he or she knew Barnes was driving to Wichita to buy drugs, why he or she thought Barnes was "possibly" selling methamphetamine from the address on Forrest Street, whether the information was known personally by the informant or was information the informant learned from one or more others, when he or she gained the knowledge conveyed in the tip, or how recently the tip was received by the D.E.U. The near-absence of details in the tip, and its purely anonymous origin, diminished its value to the point that it contributed very little to the strength of the affidavit as it related to Barnes and her residence.

*Officer Pickering's conclusion about Barnes' involvement*

Combining the Crime Stoppers tip with his training and experience, Pickering arrived at his opinion that "it would appear" Barnes supplied drugs to Adams, who then sold them in the community. Pickering's opinion did not state why he believed Adams' frequent trips to Barnes' house, often spending several hours there at a time, were in his experience consistent with drug trafficking. He viewed duration of contact differently elsewhere in the affidavit when he characterized Adams' very brief trips with passengers as consistent with drug distribution.

Pickering also did not provide details in the affidavit about why Adams' actions after leaving Barnes' residence "appear[ed] to be drug transactions at other locations," or how long after leaving Barnes' house those trips to other locations took place. Further, Pickering's stated reliance on the Crime Stoppers tip as a source of support for his conclusion was, for the reasons noted above, misplaced.

*Trash pull*

Law enforcement may search trash bags left curbside for city trash collectors within the bounds of the Fourth Amendment to the United States Constitution. *California v. Greenwood*, 486 U.S. 35, 37, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988). But "some evidence establishing a nexus between drug evidence discovered in a garbage bag and a residence to be searched is necessary to support the conclusion that the drug evidence came from the home." *Hicks*, 282 Kan. at 617. One recognized path to establishing that link is to observe a known resident placing the trash in the bin for collection. See, *e.g.*, *State v. Malone*, 50 Kan. App. 2d 167, 174-175, 323 P.3d 188, *rev. denied* 300 Kan. 1106 (2014). Pickering stated that he observed the trash being collected from the cart in the street and followed the trash truck to another location where he collected the trash from the otherwise empty bin of the truck. Pickering made no mention in the affidavit of who

8

placed the trash cart at the curb, or when it was placed there, so we cannot infer that he had that knowledge.

The State points out that identifying information, in the form of mail addressed to Barnes at the address on Forrest Street, was found in the trash along with the drug-related items, thus providing the necessary link between those items, the residence, and Barnes. Kansas courts have held that identifying information found in the same bag as contraband can provide evidence linking trash to a particular residence and the contraband. See, *e.g.*, *Malone*, 50 Kan. App. 2d at 173-74.

In this case, Pickering's affidavit not only failed to mention when the trash cart was placed by the street and by whom, it also failed to note whether the trash was loose or contained within a secured plastic bag. We understand that use of plastic bags for trash is a common—and maybe the predominant—method of delivering trash for removal, but that important information cannot be supplied by assumption. These identifying details are significant, since anyone could have passed by the residence and deposited a trash bag or drug-related item in a trash cart placed overnight by the street.

The presence in the trash cart of the drug-related items and the mail addressed to Barnes at the address on Forrest Street potentially could have supported a probable cause finding. However, that potential was left unrealized because of the fundamental information about the trash pull that was missing from the affidavit.

*Conclusion*

Barnes argues that this affidavit made a stronger case against Adams than against her. We agree. Further, she argues that the affidavit failed to make a sufficiently strong case for a warrant to search her house, falling short of the level that would allow a reviewing judge to make that "practical, common-sense decision" that a crime was

9

committed in the past or is ongoing, and that contraband or evidence of the crime would be found on her property. Even considering our "inherently deferential" standard of review, we also agree with that conclusion.

As we have detailed above, the affidavit was long on conclusory statements by Pickering and short on factual support for the claims made about Barnes' involvement in what the D.E.U. thought Adams was doing. Even the description of the trash pull, which potentially offered the most concrete evidence of drug activity at that property, was badly flawed. Our concern about when and with whom the trash cart went to the street is more than fanciful, since the affidavit also failed to explain: (1) whether the trash was bagged or loose; (2) if bagged, the number of bags; and (3) if in more than one bag, whether the mail to Barnes was in the same bag as the suspect items. If the trash was not bagged, nothing in the affidavit could distinguish whether the baggies and other items of concern came from the address on Forrest Street or any other source.

Finally, the affidavit had no information about who took the trash from the house. It could have been Barnes' roommate, Buckaloo, who was not mentioned in the affidavit. Had Buckaloo, rather than a 23-year-old female as reported in the Crime Stoppers tip, been seen to take the trash to the street, doubts may have arisen about other conclusions in the affidavit.

Assessing the affidavit as a whole, we find the district court erred in denying the motion to suppress for lack of probable cause. However, the State urges that if we should find the affidavit to be insufficient, we consider whether the good faith exception recognized in *Leon*, 468 U.S. 897, should be applied to these facts.

Since the district court found probable cause for the warrant and denied the motion to suppress, the good faith exception was not before that court. Application of the good faith exception is not properly presented for the first time on appeal. See *State v. Baskas*,

10

No. 109,760, 2014 WL 3843088, at *9 (Kan. App. 2014) (unpublished opinion), *rev. denied* 302 Kan. 1012 (2015). Therefore, the case must be remanded for the district court to consider the State's argument for application of the good faith exception and Barnes' response.

Reversed and remanded.

11