**UNITED STATES of America**

v.

**Gaki Antonio RODRIGUEZ–DIAZ**

**No. AMD 01–0065.**

United States District Court,
D. Maryland.

Sept. 11, 2001.

Christopher J. Romano, Office of U.S. Atty., Baltimore, MD, for U.S.

Kathryn Frey Balter, Federal Public Defender, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

The one count indictment in this case charges defendant Gaki Antonio Rodriguez–Diaz with possession with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. § 841(a)(1). The case arises from the seizure by a Baltimore County police officer of a quantity of heroin in consequence of a traffic stop of a motor vehicle being operated by Rodriguez–Diaz and a subsequent search of the vehicle. Rodriguez–Diaz filed a timely motion to suppress all physical evidence and statements and the court held an evidentiary hearing on May 11, 2001. Thereafter, the parties were afforded an opportunity to file supplemental memoranda on the issues generated at the hearing. On the basis of the findings of fact and conclusions of law set forth herein, I shall grant the motion to suppress evidence.

## I.  Findings of Fact

The events surrounding this case occurred on January 18, 2001. On that date, at about 1:15 p.m., Officer Rick Shull responded to a call for assistance at the Motel 6 in the Woodlawn area of Baltimore County. Upon his arrival, he met briefly with Bruce Dalrymple, the motel manager. Dalrymple reported that he called for assistance because moments before Shull's arrival at the motel, he had been engaged in a minor dispute with three guests at the motel. Just prior to Shull's arrival, the guests had completed checking out of the

motel and had departed the premises in a white Mitsubishi Gallant automobile. Dalrymple also indicated to Shull that he had suspicions that the guests, all of whom were from New York, may be involved in illegal narcotics activity. The principal basis for Dalrymple's suspicions was the fact that the guests had associated themselves during their stay with other registered guests who were themselves from Florida. Indeed, Officer Shull knew that the Woodlawn Motel 6 was a scene of frequent illegal narcotics activity.

The white Mitsubishi had turned into a dead end road upon leaving the motel; thus, it had turned about and was proceeding past the motel as Dalrymple conferred with Shull on the motel parking lot. Dalrymple pointed out the vehicle to Shull. As Shull turned to observe the vehicle, he noticed that the front passenger in the vehicle was not wearing a seat belt. Accordingly, on the basis of the seat belt violation (but most assuredly, as Shull testified at the hearing, in order to investigate the possibility that narcotics or other contraband might be in the vehicle), Shull effected a traffic stop of the vehicle.[1] He was promptly backed up by Officer Lawrence Fulton, Jr.

Rodriguez–Diaz was operating the Mitsubishi. Raphael Rodgriguez (who is no relation to the defendant) was the front seat passenger and Jeffrey Baez was the rear passenger. Shull immediately approached the driver (the defendant) and requested his driver's license and registration. Rodriguez–Diaz produced his driver's license and a rental agreement reflecting that he, Rodriguez–Diaz, had rented the vehicle in New York and was the sole authorized operator. The agreement required the vehicle to be returned on January 11, 2001, a week earlier than the encounter on January 18, 2001. Thus, while the occupants of the Mitsubishi remained in the vehicle (it was cold and raining), Shull returned to his police car with the documentation handed to him by the defendant to arrange for his dispatcher to telephone the rental company to determine whether Rodriguez–Diaz's continued possession of the vehicle after January 11, 2001, was lawful. In about ten minutes or so, Shull received confirmation that indeed the rental agreement had been renewed or extended and that Rodriguez–Diaz's possession of the vehicle was appropriate.

Up until this point in the events of January 18, 2001, the evidence of the parties is substantially identical and undisputed. Precisely what events occurred, and in what sequence, after Shull confirmed defendant's lawful possession of the Mitsubishi is vigorously disputed. The government's evidence supports the view that Shull returned the documentation to Rodriguez–Diaz and then inquired of the trio why they were in Maryland; the answer was "to see some girls." Shull then asked the occupants whether there were any drugs or guns in the car, and the answer was "no." Shull then asked the occupants for their consent to search the car, and all three gave their express consent. Shull searched the interior of the Mitsubishi, finding no contraband. Shull then asked Rodriguez–Diaz for consent to a search of the trunk of the Mitsubishi. The defendant gave consent. Officer Shull obtained the keys from the ignition and opened the trunk, which contained a jacket and a bag, each of which the defendant admitted he

---

1. The Maryland Motor Vehicle Code imposes no duty upon the operator of a motor vehicle to ensure that an adult front seat passenger is buckled up. *See* Maryland Code Ann., Trans. § 22–412.3 Thus, the seat belt violation here was committed solely by the front seat passenger, the operator of the vehicle commits no offense under such circumstances. There is no contention here that Rodriguez–Diaz was not wearing his seat belt.

owned. Shull immediately searched the bag. The heroin was discovered in a towel which had been removed from the bag. (All of the occupants of the vehicle were arrested.[2] After the three men had been transported to the police station and processed, Officer Shull issued a warning, not a violation notice, to Raphael Rodriguez for the seat belt violation.)

The defense evidence sketches a wholly different scenario. All three occupants testified at the suppression hearing, including Rodriguez–Diaz. In the defense account, after Shull returned the documents to Rodriguez–Diaz, Shull ordered them to exit the Mitsubishi, essentially "to check things out." Shull allegedly asked only Baez, the back seat passenger, for permission to search the vehicle, but Baez stated that the car was not his car. Shull asked neither Rodriguez–Diaz, the lessee/operator, nor Raphael Rodriguez, the front seat passenger, for consent. After Shull searched the interior passenger compartment, he removed the keys from the ignition and opened the trunk. He searched the bag discovered there, finding the heroin in the towel. At no time did he seek Rodriguez–Diaz's consent for a search of the vehicle in general, or the trunk or the bag found in the trunk.

Of course, the issue presented is not merely whether I believe the government's version of events or the defense's version of events. Rather, the issue is whether the government has established by a pre-

ponderance of the evidence that the warrantless stop of the Mitsubishi and the subsequent search of the vehicle (and the bag in the trunk) comported with constitutional requirements. I find under the totality of the facts and circumstances in the record that the government has not done so. In particular, I find that the government has failed to prove by a preponderance of the evidence that, under the totality of the circumstances, Rodriguez–Diaz gave his voluntary consent to the search of the vehicle or the search of the trunk of the vehicle or the search of the bag found therein.

In so finding, apart from basic credibility assessments, based on the ordinary criteria, including but not limited to witness demeanor and apparent candor, I assign significance to several aspects of the evidentiary record as a whole. First, the government concedes that the information Shull received from Dalrymple concerning the latter's suspicions about the three motel guests did not amount to reasonable suspicion and, indeed, Dalrymple's suspicions did not add anything to the reasonableness of Shull's subsequent actions.[3] Second, Shull's assertion that the occupants of the vehicle were nervous is entitled to virtually no weight.[4] Third, despite the fact that he prepared a detailed written report of the incident leading to the arrest of the defendant (and the other occupants of the Mitsubishi), Shull fails to mention therein that Rodriguez–Diaz expressly consented, separately, and when he

---

**2.** Indeed, it was disclosed at the suppression hearing that although the defendant has been indicted in this case for possession with the intent to distribute the heroin seized from the bag in the trunk of the Mitsubishi, the other occupants, Raphael Rodriguez and Jeffrey Baez, have been charged and are awaiting trial in state court with possession with the intent to distribute the same narcotics.

**3.** *See* Trans. at 20.

**4.** *See United States v. Wood,* 106 F.3d 942, 947 (10th Cir.1997)("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer").

was asked specifically for consent to a search of the vehicle trunk.[5] Fourth, there was arguably an important discrepancy, i.e., defendant's physical location at a critical time during the stop, in the testimony between the only two officers then on the scene—Shull and Fulton.[6] Fifth, although he admitted that Baltimore County police officers employ a written consent form under circumstances such as those he described in his testimony, Shull testified that he did not have any such forms in his car and he did not bother to check with his backup, Officer Fulton, to determine whether he had any forms in his police vehicle.[7]

Sixth, the testimony of Dalrymple, who testified he overheard defendant give consent on two separate occasions during the encounter, is entitled to little weight based on my assessment of his demeanor and overall credibility; his obvious bias against the defendants (in having called the police in the first instance, and in his unexplained refusal to discuss the case with the defendant's investigator when she contacted him several weeks before the hearing on the suppression motion), coupled with his unabashed enthusiasm in providing support to the government's case, instills a measure of discomfort as to his testimony that nothing else in the record overcomes.[8] Finally,

---

**5.** Presumably, as the case law holds, if Officer Shull in fact received consent to search the car, such consent would have extended to the trunk, without the need for an additional consent. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Forbes,* 181 F.3d 1, 6 (1st Cir.1999)("[I]t is reasonable to construe [defendant's] consent to search the automobile as encompassing consent to search the trunk.").

**6.** Minor discrepancies are, of course, not exceptional in any case. Nevertheless, in the *specific context of this warrantless, admittedly pretextual, stop,* surrounding an investigation of a motor vehicle operator as to whom there was no reason to detain for more than a few minutes (for the purpose of issuing a citation or warning to his *passenger*), the movement and location of the operator (and the passengers) assume special significance. Under Officer Shull's version of the events, the defendant (whose jacket was in the trunk) would have had no occasion to exit the vehicle to stand in a cold rain prior to giving consent to search; yet, Officer Shull testified that the defendant was outside the vehicle (while the passengers were still inside the vehicle) at the time Shull first sought and obtained consent to search. In contrast, Officer Fulton testified that the defendant was still in the driver's seat when Officer Shull first sought and obtained his consent.

**7.** Of course, a written consent to a search is not a legal requirement, but law enforcement officers fail to obtain a written consent when one readily could be obtained at the risk that

the government's ability to prove the voluntariness of a consent will be seriously compromised. *Cf. United States v. Marc,* 1997 WL 129324, *7 (D.Del., March 18, 1997)(granting motion to suppress in the absence of a written consent for vehicle search).

**8.** Dalrymple testified, as a rebuttal witness for the government, as follows, in pertinent part, on direct examination:

Q: While you were there, did there come a time when you observed a search of the car being conducted?

A: Sure.

Q: Prior to the search occurring, what did the officer say, if anything, to the occupants of the car about whether they could search the car or not?

A: He asked them if he could search the vehicle.

Q: The officer asked them that?

A: Yes.

Q: What was the response?

A: Yes.

Q: Who did he ask? Do you recall?

A: I honestly don't know. I mean, it was the driver, but I don't know his name.

Q: You don't know the driver's name, but you know it was the driver?

A: The driver of the vehicle was the one he asked the question to, yes.

Q: Did he conduct a search of the inside of the vehicle?

A: Yes.

Q: Incidentally, did you hear the officer ask why he wanted to search?

A: I honestly don't recall.

I am concerned over the discrepancies between the government's statement of facts, as set forth in its pre-hearing memorandum in opposition to the defendant's motion to suppress, and the testimony at the hearing. Specifically, the government asserted in its memorandum that Officer Shull asked the defendant for consent to search the bag that was discovered in the trunk. *See* Govt's Response at 3. Obviously, only the government witnesses could have been the source of this information. However, at the suppression hearing, Officer Shull never testified that he asked any such question of the defendant.[9] Morever, in that same memorandum, although the government asserted that the defendant gave the car keys to the officer, *id.*, in fact,

Q: All right. A search was conducted of the inside of the vehicle; is that correct?
A: That is correct.
Q: *How far away were you standing when you heard the officer ask?*
A: *Six feet maybe, or eight feet.*
Q: After the search of the interior of the vehicle was completed, was there a search of any other part of the vehicle?
A: Yes. Then they searched the cargo area, the trunk area.
Q: Prior to searching the cargo area or the trunk area, what, if anything, did you hear the officer ask any of the occupants of the car?
A: He asked them if he could search the trunk.
Q: Who did he ask?
A: The driver.
Q: What was the driver's response? Did you hear? First of all, did you hear the driver's response?
A: He said, yes. I mean, I don't remember the exact words, but he told them, yes, that they could search.
Q: At any time, did you hear the driver of the vehicle refuse permission to search either the ·interior of the vehicle or the trunk?
A: No.

Trans. at 148–150 (emphases added). Although Dalrymple estimated he was within six to eight feet of the encounter, *id.*, Officer Shull estimated that Dalrymple was 10 to 20 feet away. *See* Trans. at 47.

Officer Shull testified that he took the keys out of the ignition. Trans. at 60. While one or two (or three) of these factors might have scant effect on my factual findings, consideration of them in the aggregate shakes my confidence in the probity of the government's contentions, in particular as to the ultimate questions of the fact of, and the voluntariness of, any consent.

## II. Conclusions of Law

■ A. Officer Shull's justification for effecting a traffic stop of the vehicle operated by defendant was limited in scope and duration by the dual needs to: (1) identify and issue a citation (or warning) to the

9. In fairness to the Assistant United States Attorney here, whose professional handling of this case has been beyond reproach, I should note that it may be that the government attorney misrecollected or misapprehended Officer Shull's statement in his report that he, Officer Shull, asked the defendant whether he owned the jacket and the bag, *see* Trans. at 59, and not for permission to search the bag. Difficulties similar to those described here and in text have been identified by the defendant in respect to what appears to be a disturbing measure of sloppiness in the handling of the case by the law enforcement agencies involved in this investigation. *See, e.g.,* Defendant's Motion to Supplement the Record (noting that a Baltimore County detective failed to examine his file, despite earlier specific requests by the Assistant United States Attorney, until *after* the suppression hearing, for a *Miranda* advice-of-rights form signed by the defendant, requiring the Assistant United States Attorney to make an embarrassing, belated disclosure of discovery to defense counsel). The problem is that officers of law enforcement agencies seem too often to forget that their routine day-to-day handling of cases must not be allowed to denude the high importance of their responsibilities to persons charged with serious criminal activity or indeed, to the entire community they serve. This court is surely entitled to expect no less.

front seat passenger, Raphael Rodriguez, for failing to employ his seat belt, and (2) ensure officer safety. Maryland Code Ann., Trans. § 22–412.3; *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(per curiam); *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ B. Defendant, having lawfully leased the vehicle and lawfully operated it at all times, had a reasonable expectation of privacy in the vehicle and its contents, including the trunk and the bag therein, which was constitutionally protected; Officer Shull never developed individualized suspicion of the defendant based on any acts or omissions of the defendant sufficient to justify a seizure of the defendant or to search the defendant or his property, apart from the incidental seizure of the defendant attendant to the stop of the vehicle for the purpose of issuing a citation to the front seat passenger. *See Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *California v. Greenwood,* 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

■ C. Officer Shull's decision to ignore the seat belt violation he had observed committed by the front seat passenger and to proceed, instead, to conduct an investigation into the lawfulness of defendant's possession and operation of the vehicle unreasonably prolonged the defendant's detention and failed to employ the least intrusive means to conclude the traffic stop, such that, at the time Officer Shull conducted the search of the vehicle, his

continued detention of the defendant violated the defendant's Fourth Amendment right to be free from an unreasonable seizure. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)(plurality opinion); *United States v. Sharpe,* 470 U.S. 675, 693, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Childs,* 256 F.3d 559, 564 (7th Cir.2001).

■ D. Officer Shull did not obtain the defendant's voluntary consent (and no other occupant of the vehicle had the authority to consent to a search, as Officer Shull well knew) before conducting a search of the vehicle, its trunk or the bag discovered therein. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

E. The narcotics seized from the trunk of the vehicle were obtained through means that violated the defendant's constitutional right to be free from unreasonable searches and in violation of the Fourth Amendment. *Id.*

F. The exclusionary rule applies to this case and requires that the narcotics seized from the Mitsubishi be suppressed (as well as any alleged statements made by defendant after the passage of more than such reasonable period of time after the stop of the car as was necessary to permit Officer Shull to issue a citation to the front seat passenger). *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

III. Conclusion

The government has not proven by a preponderance of the evidence that during the traffic stop on January 18, 2001, Officer Shull concluded his investigation of the seat belt violation which justified his temporary detention of the defendant in a reasonable manner. The prolonged detention of the defendant violated his Fourth

Amendment rights. The government has failed to establish by a preponderance of the evidence that the search of Rodriguez–Diaz's motor vehicle (including the bag discovered therein), which occurred at a time when the defendant's detention was constitutionally unreasonable, was nevertheless justified by his voluntary consent. Accordingly, the motion to suppress shall be granted. An order follows.