### UNITED STATES of America

### v.

### Kevin SHAN.

### Criminal No. 3:07CR00232 (AWT).

United States District Court,
D. Connecticut.

July 3, 2008.

Anthony E. Kaplan, John H. Durham, Paul Narducci, U.S. Attorney's Office,

New Haven, CT, for United States of America.

Sebastian O. Desantis, Sabilia & Desantis, New London, CT, for Kevin Shan.

## RULING ON DEFENDANT'S MOTION TO SUPPRESS

ALVIN W. THOMPSON, District Judge.

Defendant Kevin Shan has moved to suppress all of the potential evidence seized from his residence at 103 Coleman Street in New London, Connecticut. For the reasons set forth below, the defendant's motion is being denied.

## I. FACTUAL BACKGROUND

On August 2, 2007, New London police officers George Potts and Brian Laurie submitted an affidavit and application for a search and seizure warrant to a judge of the Connecticut Superior Court seeking authorization to search the defendant's residence located at 103 Coleman Street in New London, Connecticut. The affidavit was comprised of 29 operative paragraphs. The affidavit included the information set forth below to establish probable cause to search the defendant's residence.

During the week ending April 28, 2007, a Bureau of Alcohol, Tobacco, Firearms and Explosives informant ("CW # 1"), who had provided reliable and credible information in the past, advised that he knew a black male using the name "Low" who was in possession of three firearms at his residence. Further, the informant advised that "Low" was selling crack cocaine from that same residence located at 49 Connecticut Avenue, New London, Connecticut.

Based on the information provided, CW-1 was outfitted with a recording device and given $50 in government funds. Prior to placement of the recording device on CW # 1's person, s/he was searched to be certain that s/he was not in possession of any type of contraband. The informant was then surveilled going directly to 49 Connecticut Avenue, New London, Connecticut where s/he entered the front door. Several minutes later CW # 1 exited the front door and went to a prearranged location to meet with law enforcement officers. At the meeting location, the recording equipment was retrieved and the informant again was searched and was found to be free of any unaccounted for money or contraband. CW # 1 handed over to Special Agent Daniel Prather a quantity of white powdery substance the informant had purchased from "Low." The white powdery substance field tested positive for the presence of cocaine. Law enforcement authorities eventually determined that "Low's" true name was Kevin Shan ("Shan"), and CW # 1 was able to verify "Low's" identity through a photo line-up consisting of eight similar looking black males.

On Wednesday, May 2, 2007, CW # 1 again met with law enforcement officers at a prearranged location. The informant, under the supervision of Special Agent Prather, had made arrangements to meet the defendant for the purpose of purchasing an AR–15 type rifle and a quantity of cocaine for $1,700. The same protocols concerning searching the informant and placing recording devices on his/her person which had been followed on the earlier occasion were followed on May 2, 2007.

At approximately 2:25 p.m. on May 2, 2007, CW # 1 was provided with $1,700 in government funds and an undercover motor vehicle. The audio/visual equipment inside the vehicle was activated and CW # 1 was observed traveling to 49 Connecticut Avenue, New London, Connecticut. The informant walked up onto the front porch of 49 Connecticut Avenue where CW # 1 remained waiting for approximately 5 minutes. Law enforcement officers then

observed a black male exit the front door of 49 Connecticut Avenue and hand the informant a large green bundle. The informant took the green bundle, approached the rear of the undercover car, and placed the bundle in the back seat. After returning to the front of 49 Connecticut Avenue and having a short conversation with the black male who had provided the green bundle, the informant returned to the undercover car and drove to a previously determined location.

At the previously determined location, CW # 1 was searched and found to be free of any unaccounted for money or contraband, and the recording equipment was removed from his/her person. The informant handed SA Prather a plastic bag containing a white powdery substance which CW # 1 believed to be cocaine. Further, SA Prather removed from the rear seat of the vehicle what was found to be a green sweatshirt which contained a Bushmaster model SM15–E2S, .223 caliber rifle, bearing serial number L254126, and 20 rounds of LC 5.56 caliber ammunition.

During CW # 1's de-briefing, s/he stated that s/he had driven to Shan's residence and exited the vehicle. S/he asked a girl who was standing in front of 49 Connecticut Avenue to tell "Low" that s/he was waiting outside. Shan then exited 49 Connecticut Avenue and met with CW # 1. The informant gave Shan the $1,700 in government funds, and Shan asked CW # 1 if they could rob the friend for whom CW # 1 said s/he was buying the gun. CW # 1 told Shan that s/he did not want to do that. Shan then went into 49 Connecticut Avenue and returned carrying the rifle which was wrapped up in the green sweatshirt. CW # 1 took the gun from Shan and placed it in the undercover car. S/he then returned to 49 Connecticut Avenue where s/he obtained a small quantity of cocaine from Shan. The white powdery

substance provided to the informant by the defendant field tested positive for the presence of cocaine.

On May 14, 2007, the same general procedures used on May 2, 2007 were followed in connection with CW # 1's purchase of a .357 revolver from Shan in exchange for $500 in U.S. currency. On that date, at approximately 7:15 p.m., CW # 1 placed a consensually monitored phone call to Shan, and Shan asked CW # 1 to pick him up and take him to his residence to get the firearm. Thereafter, CW # 1 was provided with $500 in government funds and directed to use the undercover motor vehicle. As on the prior occasion, the audio/visual equipment was activated and CW # 1 traveled to a location in the city of New London where s/he picked up Shan.

At approximately 7:37 p.m., surveillance officers observed Shan exit the undercover vehicle and enter the front door of 49 Connecticut Avenue. Approximately four minutes later, officers observed the defendant enter the passenger side of the undercover vehicle. The vehicle first traveled from 49 Connecticut Avenue to Ocean Avenue where it parked in front of a convenience store. Then, it traveled to Squire Street where CW # 1 had originally picked up Shan. The defendant exited the front passenger door of the vehicle and CW # 1 traveled directly to a pre-determined location.

At the meeting location, CW # 1 was searched and found to be free of any unaccounted funds or contraband. CW # 1 then pointed out to SA Prather the weapon which the defendant had provided and which had been placed under the armrest of the front seat of the undercover vehicle. The weapon proved to be a Smith and Wesson, model 6–1, .357 caliber revolver bearing serial number 92K7080. Further investigation revealed that the defendant did not possess a Connecticut pistol per-

mit, nor did he have any firearms registered to him.

During the week ending June 16, 2007, officers received information from a second informant ("CW # 2") that s/he had just been at "Low's" residence at 49 Connecticut Avenue and had seen several guns on the top of a dresser in Low's bedroom. Further, CW # 2, who had provided reliable evidence to the police in the past concerning narcotics activity, said that Low was selling cocaine from the 49 Connecticut Avenue dwelling.

Still later, during the week ending July 28, 2007, CW # 2 advised law enforcement officers that the defendant had moved from 49 Connecticut Avenue to a new residence, namely 103 Coleman Street in New London. According to CW # 2, s/he had been to the new residence and the defendant was in possession of the same guns at that new location. CW # 2, who pointed out the new residence to the police, described the firearms as two silver-colored .357 revolvers and one silver-colored .30 semi-automatic pistol.

As a result of the information provided by CW # 2, law enforcement officers made arrangements for CW # 2 to purchase a quantity of cocaine from Shan during the week ending August 4, 2007. The same protocols were followed regarding searching the informant for drugs prior to his/her proceeding to the defendant's 103 Coleman Street residence, maintaining surveillance on CW # 2, and then meeting at a predetermined location after the purchase had been completed.

As planned, CW # 2 was followed as s/he went to 103 Coleman Street, entered the building, and then exited. Further, CW # 2 went directly to the predetermined location where s/he handed over to law enforcement officers a clear plastic bag containing a white powdery substance. CW # 2 affirmed that s/he had purchased the cocaine inside the residence at 103 Coleman Street with "Low" (i.e. defendant Shan), who s/he had known for a period of time, present inside the residence. The substance field tested positive for cocaine.

On August 2, 2007, a search and seizure warrant was obtained from a judge of the Connecticut Superior Court for the defendant's 103 Coleman Street residence. In the affidavit in support of the warrant application, the affiants recited the sequence of the events outlined above, as well as their knowledge that people involved in illegal narcotics sales typically possess firearms and ammunition to protect their operations and/or to instill fear in others. The search warrant was issued by the Superior Court judge to whom the application was presented, and the warrant was executed on August 3, 2007. The warrant authorized a search for and the seizure of numerous items, including, but not limited to, cocaine, crack cocaine, other drugs and diluents, scales and other drug paraphernalia, handguns and other weapons. The items of property actually seized, and which the defendant seeks to suppress, included the following: two scales used in drug distribution, one box of Glad sandwich bags, a clear plastic bag containing white residue suspected of being cocaine, one box of Winchester .380 caliber bullets, two AR–15 magazines, one black "DOSKOCIL" gun carrying case, and one empty box for Remington .380 caliber bullets.

On October 11, 2007, a federal grand jury sitting in Hartford, Connecticut returned an indictment against the defendant, charging him with Dealing in Firearms Without a License, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D), Possession of Firearms by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2), and Possession with Intent to Distribute and Distribution

of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

## II. DISCUSSION

The defendant moves to suppress all evidence seized from his residence at 103 Coleman Street. The defendant argues that the search warrant application did not establish probable cause to justify the search because (1) the allegations set forth in the affidavit were stale, (2) the allegations do not establish a sufficient nexus between the sale of firearms and the 103 Coleman Street residence, and (3) the items for which the search was authorized were not illegal nor evidence of a crime.

### A. Timeliness of the Factual Allegations in the Search Warrant Affidavit

 Under the "totality of the circumstances" analysis which governs probable cause determinations, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Facts in support of a search warrant affidavit must be "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." *United States v. Beltempo,* 675 F.2d 472, 477 (2d Cir.1982) (citing *Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 77 L.Ed. 260 (1932)). "[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *United States v. Diaz,* 176 F.3d 52, 109 (2d Cir.

1999) (citations and quotation marks omitted). "Where a supporting affidavit presents a picture of continuing conduct as opposed to an isolated instance of wrongdoing ... the passage of time between the last described act and the presentation of the application become[s] less significant." *Id.* "This is especially true in a case involving an ongoing narcotics operation, where intervals of weeks or months between the last described act and the application for a wiretap do not necessarily make the information stale." *Id.*

 In this case, the search warrant affidavit contains allegations suggesting that the defendant was involved in a pattern of continuing criminal activity for a period of three months immediately prior to the application for the search warrant. The affidavit stated that, during the week of April 28, 2007, a cooperating witness of proven reliability purchased a quantity of cocaine from the defendant at his 49 Connecticut Avenue residence. It stated that, on May 2, 2007, the same cooperating witness purchased a rifle and a quantity of cocaine from the defendant at his residence. It also stated that, on May 14, 2007, the same cooperating witness purchased a revolver from the defendant at his residence. All three of these transactions took place under the supervision of law enforcement officers. In addition, the affidavit stated that, during the week of June 16, 2007, another cooperating witness of proven reliability informed investigators that the defendant was selling cocaine from his residence and that s/he had seen several guns there. During the week ending July 28, 2007, the second cooperating witness informed the authorities that the defendant had moved and that s/he had seen the same guns at the defendant's new residence at 103 Coleman Street. The affidavit stated that, during the week ending August 4, 2007, the second cooperating

witness made a controlled purchase of cocaine inside the 103 Coleman Street residence while the defendant was present. This transaction also occurred under the supervision of law enforcement officers. The search warrant was issued on August 2, 2007.

Based on the pattern of conduct alleged in the affidavit and the proximity in time of the last controlled purchase to the application for the search warrant, the allegations contained in the affidavit were not stale. Those allegations indicated that there was a fair probability that evidence of illegal drugs and firearms would be found at the defendant's 103 Coleman Street residence.

### B. Nexus Between the Sale of Firearms and the Residence Searched

■ The Second Circuit has held that a "showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *U.S. v. Singh*, 390 F.3d 168, 182 (2d Cir.2004). In this case, both cooperating witnesses told the investigators that the defendant had multiple firearms at his residence at 49 Connecticut Avenue, and on two separate occasions, the first cooperating witness purchased a firearm from the defendant which had come from that residence. In addition, the second cooperating witness told investigators that s/he had seen the some of the same firearms at the defendant's new residence at 103 Coleman Street that s/he had seen at his 49 Connecticut Avenue residence. Also, the investigators stated in their affidavit that, based on their experience, persons involved in the sale of controlled substances often possess firearms and ammunition. They also stated that a state police database showed that the defendant did not have a Connecticut pistol permit or any

firearms registered to him. This information provided by the investigators established a sufficient nexus between the alleged criminal activities relating to the transfer of firearms by the defendant and the defendant's residence at 103 Coleman Street.

### C. The Items Covered by the Warrant

■ With respect to the evidence of drugs or drug paraphernalia sought in the search warrant application, the defendant concedes that "the drugs claimed in the warrant are clearly illegal" and that "the allegations contained in the warrant involve illegal activity on the part of Mr. Shan." (Def.Mem.Supp.(Doc. No. 44) at 10, 12). However, the defendant argues that the allegations "do not put Mr. Shan in the category of a drug trafficker." (*Id.* at 12). The defendant emphasizes that the warrant application does not contain allegations that the defendant was involved in drug dealing over an extended period of time, that the defendant was involved with large quantities of drugs, or that the defendant had previous drug convictions, and that it does not refer to other common indicia that an individual is selling drugs.

■ The defendant's argument is unpersuasive. As an initial matter, there is no requirement that a person must be a major drug trafficker or be involved in a large conspiracy in order to violate statutes criminalizing the possession or sale of cocaine. The affidavit in support of the warrant application states that both cooperating witnesses informed authorities that the defendant was selling cocaine and that the defendant actually sold cocaine to the cooperating witnesses on several occasions. These allegations are sufficient to establish probable cause that the defendant was committing a criminal offense.

■ With respect to the evidence of firearms sought in the warrant application, the defendant argues that Connecticut law does not prohibit the sale of rifles without filing paperwork or the sale of handguns without a permit. However, it is illegal for any person who is an unlawful user of a controlled substance to possess a firearm. *See* 18 U.S.C. § 922(g)(3). In addition, Connecticut law prohibits selling or transporting pistols or revolvers to persons who do not hold a valid permit, without using the required sales form, without providing a trigger lock, or without recording certain information concerning the purchaser of the weapon. *See* Comn. Gen.Stat. § 29–33. The allegations set forth in the warrant application are sufficient to establish that the defendant violated these statutes.

### D. The Good Faith Exception

■ Evidence is still admissible at trial even if seized pursuant to a defective warrant if "an officer acting with objective good faith ... obtained a search warrant from a judge or a magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). "The test of objective good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Moore*, 968 F.2d 216, 222 (2d Cir.1992) (quoting *Leon*, 468 U.S. at 922, n. 23, 104 S.Ct. 3405). Here, investigators submitted a written application to a judge seeking authorization to search a particular location for certain items of evidence. The judge granted the application after determining that probable cause had been established. The investigators then searched the defendant's residence in accordance with the court's order. Thus, assuming *arguendo* that the warrant application was defective, the search conducted in this case was con-

stitutionally permissible under the good-faith exception.

The defendant argues, first, that the good-faith exception does not apply because "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable ... [and] ... the warrant was so facially deficient that a reasonable officer could not have believed it to be valid." *Leon*, 468 U.S. at 923, 104 S.Ct. 3405. Because the court has concluded that the affidavit sets forth allegations sufficient to establish probable cause, the court finds this argument unpersuasive.

■ Second, the defendant argues that the search warrant was issued by a state court judge and that Connecticut courts do not recognize the good-faith exception set forth in *Leon*. However, Connecticut courts have held only that the good-faith exception is not available under the Connecticut Constitution. In *California v. Greenwood*, 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Supreme Court held that "whether or not a search is reasonable within the meaning of the Fourth Amendment" has never "depend[ed] on the law of the particular State in which the search occurs." Further, although "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution," the Court has "never intimated ... that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs." *Id.See also Virginia v. Moore*, — U.S. —, —, 128 S.Ct. 1598, 1607, 170 L.Ed.2d 559 (2008). Thus, the fact that Connecticut courts do not recognize a good-faith exception under the Connecticut Constitution has no bear-

ing on whether such an exception exists under the Fourth Amendment.

## III. CONCLUSION

For the reasons set forth above, Defendant Kevin Shan's Motion to Suppress Evidence(Doc. No.42) is hereby DENIED.

It is so ordered.