THAPAR, Circuit Judge, concurring in part and dissenting in part.
The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This mandate, though seemingly straightforward, has generated a morass of legal precedent that is often confusing, contradictory, and incomplete. After over two-hundred years, we are still not sure whether the Amendment protects privacy or property, and, in turn, what questions are relevant for determining whether a search occurred or if it was reasonable.
At times like this, courts should turn back to first principles. The Amendment's text tells us that a Fourth Amendment violation occurs when three things are *568 true: (1) the government engages in a search, (2) of a person, house, paper, or effect, (3) that unreasonably violates a person's right to be secure in that object. To understand the meaning of those terms and place those inquiries in context, we look to the Fourth Amendment's meaning at the founding. For example, history shows that a "search" meant then what it means now: a purposeful, investigative act (and nothing more). When we apply this meaning to Morgan and Graf's case, no Fourth Amendment violation occurred here: the county's policy did not direct the officers to conduct a search. And, for slightly different reasons, existing Supreme Court precedent compels the same conclusion. Therefore, I concur in the majority's decision to affirm the grant of qualified immunity but dissent from the Monell liability holding.
I.
Some words in the Constitution are "terms of art." See, e.g. , McDonald v. City of Chicago , 561 U.S. 742, 813-15, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Thomas, J., concurring in part and concurring in the judgment) ("due process of law"); Collins v. Youngblood , 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) ("ex post facto law"); Holland v. Illinois , 493 U.S. 474, 493, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) ("jury"). The word "search," however, is not one of them. See Carpenter v. United States , --- U.S. ----, 138 S.Ct. 2206, 2238, --- L.Ed.2d ---- (2018) (Thomas, J., dissenting); Orin S. Kerr, The Curious History of Fourth Amendment Searches , 2012 Sup. Ct. Rev. 67, 71-72 (2012) (noting that the question of what "search" meant "rarely arose" at the time of the founding). Instead, we look to the ordinary meaning to define the term. And the ordinary meaning of "search" has remained unchanged since the people ratified the Fourth Amendment over two hundred years ago. To search is "to look into or over carefully or thoroughly in an effort to find something." Webster's Third New International Dictionary of the English Language (2002); see also 2 Noah Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989) ("To look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief.").[1] In other words, officers conduct a search when they engage in a purposeful, investigative act.
Some examples bring the definition to life. Kerr, supra , at 72 ("The little evidence of what searches meant in the late eighteenth century is mostly by way of example."). Start with the oppressive English search practices that inspired the founding generation to adopt the Fourth Amendment. See Riley v. California , --- U.S. ----, 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014) ; Leonard Levy, Origins of the Bill of Rights 160-61 (1992). In the mid-eighteenth century, Parliament authorized writs of assistance, which allowed colonial customs officials to search people's homes for goods that were illegally imported. See Emily Hickman, Colonial Writs of Assistance , 5 New Eng. Quart. 83, 83-84 (1932); Levy, supra , at 156-57; see also Stanford v. Texas , 379 U.S. 476, 481, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) ("The hated writs of assistance had given custom officials blanket authority to search where they pleased for goods imported in violation of the British tax laws."). These searches were intrusive.
*569 Indeed, Charles Paxton, a famous "Surveyor and Searcher" in Massachusetts, was permitted to enter into any ship, vessel, shop, house, warehouse, or other place "to make diligent search into any trunk[,] chest[,] pack[,] case[,] truss[,] or any other parcel or package whatsoever." Josiah Quincy, Jr., Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay Between 1761 and 1772 at 420 (Boston, Little, Brown & Co. 1865). In arguing against this sweeping search authority, James Otis contended that customs officials should not have authority to enter a person's home and "rifle every part of it." Essay on the Writs of Assistance Case , Boston Gazette, Jan. 4, 1762; see 10 Works of John Adams 248 (C. Adams ed. 1856) (referring to James Otis's speech denouncing writs of assistance as where "the child Independence was born"). Others complained that their "houses and even [their] bed chambers, [were] exposed to be ransacked," and their "boxes[,] chests & trunks broke open[,] ravaged and plundered." Levy, supra , at 166.
Meanwhile in England, King George III's Secretary of State, Lord Halifax, began issuing general warrants to go after the authors, publishers, and printers of newspapers critical of the English government. Laura Donohue, The Original Fourth Amendment , 83 U. Chi. L. Rev. 1181, 1197, 1201, 1205 (2016). Among dozens of others, John Wilkes, John Entick, and Dryden Leach were suspects. The King's messengers went to Wilkes's home first, walked inside, broke the locks on his desk drawers, and "rummaged all the papers together they could find." Wilkes v. Wood , (1763) 98 Eng. Rep. 489, 491 (K.B.). A few months later, they went to Entick's home and searched "all the rooms ... and all the boxes so broken open, and read over, pryed into, and examined all [of his] private papers [and] books." Entick v. Carrington , (1765) 95 Eng. Rep. 275, 275 (K.B.). And finally, they paid Leach a visit and spent six hours searching his home for his books and papers. Money v. Leach , (1765) 97 Eng. Rep. 1075, 1079 (K.B.). In all three cases, the King's messengers were found liable for trespass. Leach , 97 Eng. Rep. at 1089; Entick , 95 Eng. Rep. at 818; Wilkes , 98 Eng. Rep. at 499. But more importantly, these cases and the colonies' growing opposition to writs of assistance provide some context about what the founding generation envisioned by the term "search": looking through somebody's belongings to find evidence of something illegal. See Kerr, supra , at 72 ("Famous search and seizure cases leading up to the Fourth Amendment involved physical entries into homes [and] violent rummaging for incriminating items once inside....").
The meaning of "search" at the founding did not change after the United States won independence. Though the English could no longer search our homes to find uncustomed goods, Anti-Federalists feared that the federal government would adopt the same oppressive search practices that England used to collect taxes. In 1788, "A Farmer and Planter" penned an essay expressing concern that federal excise officers would "break open [their] doors, chests, trunks, desks, [and] boxes, and rummage [their] house[s] from bottom to top" for goods for which no tax had been paid. A Farmer and Planter, in 5 The Complete Anti-Federalist 75 (Herbert J. Storing ed. 1981); see also John DeWitt Letter IV, in 4 The Complete Anti-Federalist at 33; A Columbian Patriot, in 4 The Complete Anti-Federalist at 278-79. Patrick Henry contended that tax collectors "may go into your cellars and rooms, and search, ransack, and measure, every thing [people] eat, drink and wear." 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 448-49 (Jonathan Elliot ed., 2d ed. 1836).
*570 And after the people ratified the Fourth Amendment to protect against such abuses, early courts confirmed this understanding of a "search." Those courts found that searches had occurred where officers opened and examined sealed letters or packages, Ex parte Jackson , 96 U.S. 727, 732, 24 L.Ed. 877 (1877), looked through a man's shop and apartments for jewelry, Larthet v. Forgay , 2 La. Ann. 524, 525 (La. 1847), poked through a man's cellar to look for stolen barrels of flour, Bell v. Clapp , 10 Johns. 263, 265 (N.Y. 1813) (per curiam), and entered a man's house, "turned over the beds," looked through "every hole" and "required every locked place to be opened," Simpson v. Smith , 2 Del. Cas. 285, 287 (Del. 1817).
This history thus shows that when the Framers used the word "search," they meant something specific: investigating a suspect's property with the goal of finding something. See Katz v. United States , 389 U.S. 347, 367, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Black, J., dissenting) ("The Fourth Amendment was aimed directly at the abhorred practice of breaking in, ransacking and searching homes and other buildings and seizing people's personal belongings...."). In this way, the original meaning of the term matches the ordinary one. A "search" under the Fourth Amendment is what we would intuitively think a search looks like in any other context.
The Supreme Court's current Fourth Amendment jurisprudence, however, has taken the meaning of "search" a step further. Rather than simply asking whether the government engaged in purposeful, investigative conduct, both of the Court's prevailing tests add a threshold question that conflates the search inquiry with the reasonableness one. Start with Katz 's "reasonable expectation of privacy" test. Id. at 361, 88 S.Ct. 507 (Harlan, J., concurring). Under that framework, the Court is willing to apply the Fourth Amendment's protections only if the officers' conduct violates a person's "(subjective) expectation of privacy" that "society is prepared to recognize as reasonable." Id. But a search can plainly occur regardless of whether a person reasonably believes the area the officers rummage through is private. We can see as much from the cases that apply Katz 's test. Consider California v. Greenwood , where the Court held that an officer who rifled through a suspect's garbage to find evidence of drug use did not conduct a search because the suspect could not reasonably expect the garbage to remain private after putting it out for collection. 486 U.S. 35, 37-38, 40, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). Or consider United States v. Miller , where officers read through a suspect's bank records to investigate tax evasion. 425 U.S. 435, 437, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The Court held that no search occurred because the suspect had exposed the records to the bank's employees and thus forfeited his privacy in them. Id. at 442, 96 S.Ct. 1619.
In both cases, the jurisprudence is misguided: the officers engaged in a search because looking through somebody's garbage or financial records for evidence of a crime is purposeful, investigative conduct. And whether we think the officers' conduct was permissible-either because the suspect abandoned the garbage or shared the bank records with third parties-does not change that result. Those considerations get at whether the search was reasonable , not whether a search occurred in the first place. See Carpenter , 138 S.Ct. at 2243 (Thomas, J., dissenting) ("[R]easonableness determines the legality of a search, not 'whether a search ... within the meaning of the Constitution has occurred .' " (quoting Minnesota v. Carter , 525 U.S. 83, 97, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Scalia, J., concurring) ) ); Akhil R. Amar, *571 Fourth Amendment First Principles , 107 Harv. L. Rev. 757, 769 (1994) ("[I]n the landmark Katz case, the Court, perhaps unconsciously, smuggled reasonableness into the very definition of the Amendment's trigger...."); see also William Baude & James Y. Stern, The Positive Law Model of the Fourth Amendment , 129 Harv. L. Rev. 1821, 1871 (2016) ("The structure of the doctrine is especially puzzling in the Katz regime, which creates a separate reasonableness analysis at the first step of the Fourth Amendment framework, prior to evaluating the reasonableness of the government's conduct at the second step."). Smuggling both questions into one is not faithful to the Amendment's text and ends up narrowing the scope of its coverage. See Knowlton v. Moore , 178 U.S. 41, 87, 20 S.Ct. 747, 44 L.Ed. 969 (1900) (noting the "elementary canon of construction which requires that effect be given to each word of the Constitution" (emphasis added) ); see also Carpenter , 138 S.Ct. at 2246 (Thomas, J., dissenting) (noting that the Katz test "threatened to narrow the original scope of the Fourth Amendment"); Thomas K. Clancy, What Does the Fourth Amendment Protect: Property, Privacy, or Security? , 33 Wake Forest L. Rev. 307, 331-34 (1998) (listing cases "rejecting any legitimate expectation of privacy" or finding only a "reduced expectation of privacy" under Katz ).
After almost five decades of Katz precedent, it became apparent that requiring a reasonable expectation of privacy pushed too much police conduct outside of Fourth Amendment scrutiny. So in United States v. Jones , the Court made clear that a litigant's rights "do not rise or fall with the Katz formulation" if that formulation does not "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." 565 U.S. 400, 406, 132 S.Ct. 945, 181 L.Ed.2d 911 (alterations in original) (quoting Kyllo v. United States , 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ). The Court told us that there was another way to determine whether a search occurred: asking whether the officers "learned what they learned only by physically intruding on [one's] property to gather evidence." Florida v. Jardines , 569 U.S. 1, 9, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) ; see also Jones , 565 U.S. at 405, 132 S.Ct. 945. This property-based approach is closer to the ordinary and original meaning than Katz . But it, too, imposes an artificial limit on the meaning of "search." A search can occur without an "intrusion" (or as elsewhere described, a "trespass"). Jones , 565 U.S. at 405, 132 S.Ct. 945 ; see also Kerr, supra , at 68 ("Neither the original understanding nor Supreme Court doctrine equated searches with trespass."). For example, imagine that John Entick invited the King's messengers into his house and gave them permission to look through his drawers for his books and papers. Would anybody contend that the messengers did not search Entick's home under the ordinary meaning of the word simply because they were legally present? No. The officers engaged in purposeful and investigative conduct. And whether we think the messengers' conduct is permissible because Entick authorized them to do it gets at the reasonableness of the search, not whether a search occurred. Like Katz 's reasonable expectation of privacy test, then, the "intrusion" or "trespass" question comes at the wrong place in the Fourth Amendment framework.
If we applied the ordinary and original meaning of the word "search" (and left the question of reasonableness where it belongs), many things that are currently considered outside the Amendment's scope might come back in. As discussed above, rifling through a person's garbage and reading through their bank records would both count as a search. See Greenwood , 486 U.S. at 37-38, 108 S.Ct. 1625 ;
*572 Miller , 425 U.S. at 437, 96 S.Ct. 1619. So too would flying a helicopter four-hundred-feet over a person's greenhouse to look through an opening in its roof. See Florida v. Riley , 488 U.S. 445, 448, 450, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). As would traipsing through somebody's farm to look for marijuana or peering into somebody's barn with a flashlight to see if they are doing something illegal. See United States v. Dunn , 480 U.S. 294, 298, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) ; Oliver v. United States , 466 U.S. 170, 173, 179-80, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).
Not only that, but faithfully applying the term's meaning may make the courts' initial job easier. Determining whether somebody has a subjective expectation of privacy that society is willing to recognize as reasonable leaves much to the "judicial imagination" and often results in judges deciding "whether a particular practice should be considered a search under the Fourth Amendment." Carpenter , 138 S.Ct. at 2264 (Gorsuch, J., dissenting); id. at 2246 (Thomas, J., dissenting). As a result, the Court's precedents applying Katz "bear the hallmarks of subjective policymaking," which of course, courts are not equipped (or permitted) to do. Id. at 2246 (Thomas, J., dissenting); see also Carter , 525 U.S. at 97, 119 S.Ct. 469 (Scalia, J., concurring) (pointing out that "unsurprisingly, those 'actual (subjective) expectation[s] of privacy' 'that society is prepared to recognize as reasonable,' bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable" (alterations in original) (quoting Katz , 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring) ) ). Asking whether an officer engaged in a purposeful, investigative act brings courts back into their wheelhouse: analyzing the facts before them.
Returning to the original meaning would also eliminate the property-based approach's threshold question-whether there was an intrusion or trespass-simplifying the initial search inquiry. The Court's decision in Kyllo v. United States shows why. 533 U.S. at 27, 121 S.Ct. 2038. There, the Court had to decide whether officers conducted a search when they used a thermal imager to scan the outside of a home for heat signatures. Id. at 29-30, 121 S.Ct. 2038. One possible answer could have been no. The Court had long held that "naked-eye surveillance of a home" did not amount to a search because "the eye cannot ... be guilty of trespass." Id. at 31-33, 121 S.Ct. 2038 (internal quotation marks omitted). But the case at hand presented something different: the officers were using more than their naked eye yet doing something short of common law trespass. Id. To thread the needle, the Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not have been obtained without physical intrusion into a constitutionally-protected area constitutes a search-at least where (as here) the technology in question is not in general public use." Id. at 34, 121 S.Ct. 2038 (internal quotations and citation omitted). What to do if the technology is in general public use, the Court has not said. And how to go about analogizing ever-evolving technology to on-foot search techniques will likely prove more difficult than the Court envisions. Under the ordinary and original meaning of "search," however, neither question arises. The officers conducted a search in Kyllo because using a thermal imager to determine whether heat is emanating from a house is a purposeful, investigative act.
A "search" under the Fourth Amendment is thus easier to identify when we are faithful to the ordinary and original meaning of the term, and the concept is broader than the Court's current jurisprudence contemplates.
*573 II.
This brings me to the case at hand. The Fairfield County police received two anonymous tips that Morgan and Graf grew marijuana and cooked methamphetamine in their house. So five officers went to their home for a "knock and talk," a police tactic where an officer walks up to the front door of a house and seeks to speak with a suspect and/or gain consent for a search. Consistent with county policy, two officers walked up to the front door, and the rest surrounded the perimeter of the house, standing five-to-seven feet from its exterior. One officer went around back and noticed marijuana plants growing on Morgan and Graf's second-story deck. With this information, the officers secured a warrant to search inside the home. Now Morgan and Graf contend that when the officers surrounded the home, they engaged in an unreasonable search in violation of the Fourth Amendment.
The City Policy. Let's start with the policy. The question before the court is whether the policy directed officers to violate Morgan and Graf's rights. The answer under both current doctrine and the original meaning is no.
In Jardines , the Supreme Court held that an unreasonable Fourth Amendment search occurs when an officer intrudes a constitutionally-protected zone, i.e., the house, to gather evidence. See 569 U.S. at 6, 133 S.Ct. 1409. So, to be unconstitutional, the policy must direct officers (1) to enter a constitutionally protected zone, and (2) to gather evidence. Id. at 9, 133 S.Ct. 1409.
Here, the majority is correct that the policy directed officers to enter a constitutionally-protected zone. Morgan and Graf have a right to be secure in their home, which includes the curtilage of the home. See id. at 6, 133 S.Ct. 1409 (noting that "curtilage" is the area "immediately surrounding and associated with" a house); Amos v. United States , 255 U.S. 313, 314, 346, 41 S.Ct. 266, 65 L.Ed. 654 (1921) ; see also Dunn , 480 U.S. at 294, 107 S.Ct. 1134 ; Oliver , 466 U.S. at 180, 104 S.Ct. 1735 ; 4 William Blackstone, Commentaries on the Laws of England *225 (noting that the "capital house protects and privileges all its branches and appurtenants, if within the curtilage"). Since the county policy required the officers to go "onto the back of the property" and generally be within "five-to-seven feet" of the house, it directed them to enter the curtilage. R. 45-7, Pg. ID 542; R. 45-6, Pg. ID 533.
But the county policy did not direct officers to gather information while there. As such, there is no search. See Jardines , 569 U.S. at 6, 133 S.Ct. 1409 (holding that to be a search officers must gather information while in the protected zone); see also Collins v. Virginia , --- U.S. ----, 138 S.Ct. 1663, 1670, 201 L.Ed.2d 9 (2018) ("When a law enforcement officer physically intrudes on the curtilage to gather evidence , a search within the meaning of the Fourth Amendment has occurred." (emphasis added) ); Jones , 565 U.S. at 406 n.3, 132 S.Ct. 945. For if an officer is trick-or-treating with their kids in the constitutionally protected zone, it is not a Fourth Amendment problem. Nor is it a problem if an officer is "approaching your home to return your lost dog or to solicit for charity." United States v. Carloss , 818 F.3d 988, 1005 (10th Cir. 2016) (Gorsuch, J., dissenting). The officer must engage in some sort of investigation to implicate the Fourth Amendment's protections. Jardines , 569 U.S. at 6, 133 S.Ct. 1409. Yet the county policy directing officers to secure the perimeter is designed to do one thing: ensure officer safety. As the officers testified, whenever they conduct a knock and talk, there is a risk that the officer knocking on the front door "could be ambushed by somebody coming out of the back door." R. 45-6, Pg. ID 525. Or a dangerous individual *574 might flee the residence. And since the officers suspected that Morgan might have been dangerous, the policy required an officer to stand at every corner of the house. If the policy had required the officers surrounding the house to also investigate while there, the county would be directing the officers to violate the Fourth Amendment. But the county's policy was silent as to any information-gathering mandate for the officers. As such, the policy itself did not direct the officers to violate the Fourth Amendment.
Similarly, when analyzing the policy under the original meaning, the answer is the same. But the first question is different. Whereas the property-based approach asks whether the officers were in a constitutionally-protected zone, the original meaning asks if those officers were conducting a search. The key inquiry is not whether officers conduct a search while in the protected area, but rather whether they conduct a search of the protected area. See infra Part I. While this distinction may lead to different outcomes in other cases, in Morgan and Graf's case it does not. Here the county's policy did not direct officers to engage in a purposeful, investigative act of Morgan and Graf's home. Accordingly, since there was no search directed by the policy, no constitutional violation occurred under the original meaning of the Fourth Amendment.[2]
The officers. Turning to the officers, I agree with the majority that the constitutional violation was not clearly established. But, if I was writing on a clean slate, I would remand. And the question I would direct the district court to answer is whether the officers engaged in a purposeful, investigative act to find the marijuana plants.
III.
As the county's policy did not direct a search in Morgan and Graf's case (and the original meaning approach to the Fourth Amendment would require a remand to determine whether the officers in fact "searched"), the court need not go further. If there had been a search, however, then I would continue to adhere to a Fourth Amendment analysis guided by the Amendment's text and its original meaning. To do this analysis, ordinarily the court would need to look at the contours of the constitutionally-protected zones-persons, houses, papers, and effects.
*575 U.S. Const. amend. IV ; see, e.g. , Maureen E. Brady, The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection , 125 Yale L.J. 946, 987 (2016). Such an analysis would not prove difficult here as the marijuana plants were squarely within a constitutionally-protected zone, i.e., on the back-deck within the house's curtilage.[3] The court would also need to decide the appropriate source of law to determine when a person is "secure in" one of those constitutionally-protected zones. See Carpenter , 138 S.Ct. at 2241-42 (Thomas, J., dissenting); id. at 2269 (Gorsuch, J., dissenting). For instance, similar to the Fifth and Fourteenth Amendments, should courts look to state property law to determine what rights someone has in the constitutionally-protected zone? See Baude & Stern, supra , at 1842-43 (suggesting courts look to existing law (usually state) to determine constitutional protections); Richard Re, The Positive Law Floor , 129 Harv. L. Rev. F. 313, 332 (2016) ("[W]hen lawmakers guard against privacy intrusions by private parties, then similar intrusions by the government would be presumptively unreasonable."). And, of course, the court must grapple with the appropriate meaning and function of the term "unreasonable." While strong evidence suggests that "unreasonable" should be understood as "against the common law," there is evidence that the original public meaning may have been broader. Compare Donahue, supra , at 1192 (arguing that "unreasonable" means "against the common law"), with David A. Sklansky, The Fourth Amendment and Common Law , 100 Colum. L. Rev. 1739, 1778-84 (2000) (describing that "unreasonable" may have encompassed more than "against the common law"). Some of these inquiries might prove relatively easy, while others are certainly hard. But, luckily, judges are aided in this endeavor by the contributions of very astute scholars. And in the end, courts and parties will benefit from thoughtful briefing and scholarship that brings clarity to the Fourth Amendment's meaning and certainty to a search and seizure jurisprudence that has long since gone awry.
* * *
While I believe it is time for the courts to be more faithful to the Fourth Amendment's text, I am duty-bound to apply Supreme Court precedent. Therefore, I concur in part and dissent in part.

See also 2 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773) ("Inquiry by looking to every suspected place."); 2 John Ash, The New and Complete Dictionary of the English Language (2d ed. 1795) ("An enquiry, an examination, the act of seeking, an enquiry by looking into every suspected place; a question; a pursuit.").

That is, of course, not to say that police officers should be allowed to run roughshod over people's property so long as a court does not determine that they conducted a search. The officers in this case could be liable for trespass. Under Ohio law, no person is permitted to "[k]nowingly enter or remain on the land or premises of another." Ohio Rev. Code Ann. § 2911.21(A)(1) (criminal trespass statute). And though the officer at the front door was permitted to walk up to the house and knock without violating the law, the other officers were not allowed to use his lawful presence as a gateway to the rest of his property. See Gladon v. Greater Cleveland Reg'l Transit Auth. , 75 Ohio St.3d 312, 662 N.E.2d 287, 292 (1996) ("If the invitee goes outside the area of his invitation, he becomes a trespasser or a licensee, depending upon whether he goes there without the consent of the possessor, or with such consent." (quoting Restatement (Second) of Torts § 332 (Am. Law Inst. 1965) ) ). Ohio immunity may ultimately bar such a suit, but should practices become sufficiently egregious, the people of Ohio could change whether immunity applies. Indeed, private tort suits against officers used to be the only mechanism to assert a Fourth Amendment right-the exclusionary rule, Section 1983, and Bivens actions did not yet exist. See Collins , 138 S.Ct. at 1676 (Thomas, J., concurring) ("Historically, the only remedies for unconstitutional searches and seizures were 'tort suits' and 'self-help.' "); Gardner v. Neil , 4 N.C. 104, 104 (1814) ; Akhil R. Amar, The Bill of Rights 69 (1998) (noting that the "paradigmatic way in which Fourth Amendment rights were to be enforced" was through civil suits under common law tort claims).

Though not presented by this case, how ever-changing technology fits within the contours of these zones may continue to challenge courts. See Orin S. Kerr, The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution , 102 Mich. L. Rev. 801, 807 (2004) (arguing that "regulating developing technology through the Fourth Amendment poses significant difficulties for courts").